TRACINDA CORPORATION, a Nevada Corporation, Plaintiff,

v.

DAIMLERCHRYSLER AG, a Federal Republic of Germany corporation; Daimler–Benz AG, a Federal Republic of Germany corporation; Jüergen Schrempp, a citizen of the Federal Republic of Germany; and Manfred Gentz, a citizen of the Federal Republic of Germany, Defendants.

No. CIV.A. 00–993–JJF.

United States District Court, D. Delaware.

April 7, 2005.

See, also, 2005 WL 730322.

A. Glichrist Sparks, III, Alan J. Stone, and Natalie J. Watson, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, Los Angeles, CA (Terry N. Christensen, Mark G. Krum, Eric P. Early, of counsel), Fried, Frank, Harris, Shriver & Jacobson, New York, NY (William G. McGuinness, Julie E. Kamps, of

counsel), for Plaintiff Tracinda Corporation.

Thomas J. Allingham II, and Robert S. Saunders, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, DE, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY (Jonathan J. Lerner, Lea Haber Kuck, Joseph N. Sacca, of counsel), for Defendants DaimlerChryler AG, Daimler–Benz AG, Jürgen Schrempp and Manfred Gentz.

## OPINION

FARNAN, District Judge.

### INTRODUCTION

This action was brought by Plaintiff, Tracinda Corporation, ("Tracinda") against Defendants, DaimlerChrysler AG, Daimler–Benz AG ("Daimler–Benz" or "Daimler"), Jürgen Schrempp and Manfred Gentz (collectively, "Defendants") alleging violations of securities laws, common law fraud and conspiracy in connection with the November 1998 merger between Chrysler Corporation ("Chrysler") and Daimler–Benz AG ("Daimler–Benz"). A thirteen day bench trial was held on the claims and defenses raised by the parties. This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law on the issues tried before the Court.

### JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and the doctrine of supplemental jurisdiction. Additionally, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the matter arises between citizens of a State and citizens of a foreign state.

Venue in this judicial district is uncontested and is appropriate pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because the transactions giving rise to this action occurred in substantial part in the District of Delaware, and Defendants conduct or transact business in the District of Delaware. In addition, venue is appropriate in this district under the terms of the Stockholder Agreement dated May 7, 1998, between and among, Daimler–Benz, Chrysler and Tracinda, which provides that the parties consent "to the personal jurisdiction of any federal court located in the State of Delaware or any Delaware state court in the event any dispute arises out of or relates to this Agreement or any of the transactions contemplated by this Agreement." DX 108 at 5–6. The Stockholder Agreement also provides that the Agreement "shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the principles of conflicts of law thereof." *Id.* at 6.

### PROCEDURAL BACKGROUND

Tracinda filed its Complaint in this action on November 27, 2000, alleging claims for violations of Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b–5 and 14a–9 of the rules promulgated thereunder, Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and claims for common law fraud and conspiracy. In addition to naming Defendants, Tracinda also sued Hilmar Kopper.

Separate motions to dismiss were filed by Defendants and Hilmar Kopper. The Court granted Defendants' motions on Tracinda's claim for civil conspiracy, but denied the motions, as they applied to Tracinda, in all other respects. *Tracinda Corporation v. DaimlerChrysler AG*, 197

F.Supp.2d 42 (D.Del.2002) ("*Tracinda*"). By separate Memorandum Opinion and Order, the Court denied Defendant Kopper's motion to dismiss for lack of personal jurisdiction with leave to renew.[1] *In re DaimlerChrysler AG Securities Litigation*, 197 F.Supp.2d 86 (D.Del.2002) ("*In re DaimlerChrysler I*"). After the parties engaged in discovery, Defendant Kopper renewed his motion to dismiss for lack of personal jurisdiction. Defendants and Hilmar Kopper also separately moved for summary judgment. The Court granted Defendant Kopper's motion to dismiss for lack of personal jurisdiction, *In re DaimlerChrysler AG Securities Litigation*, 247 F.Supp.2d 579 (D.Del.2003) ("*In re DaimlerChrysler II*"), and denied Defendants' Motions for Summary Judgment issuing two opinions, one on the question of whether the claims against Defendants were time-barred under the applicable statute of limitations and one on the remaining issues raised by Defendants. *In re DaimlerChrysler AG Sec. Litig.*, 269 F.Supp.2d 508 (D.Del.2003) (discussing statute of limitations issue) ("*In re DaimlerChrysler III*"); *In re DaimlerChrysler AG Sec. Litig.*, 294 F.Supp.2d 616 (D.Del. 2003) ("*In re DaimlerChrysler IV*").

Shortly before trial, Tracinda voluntarily dismissed its claims under Sections 11, 12 and 15 of the Securities Act, leaving for trial the common law fraud claim and the claims under the Exchange Act. Trial commenced on December 1, 2003, but was recessed due to a discovery production issue that arose near the end of the trial. Trial was completed in February 2004, and

post-trial briefing was completed in May 2004.[2]

## FINDINGS OF FACT

The Court makes the following findings with regard to the factual background related to this action. The Court makes additional findings where necessary in the context of its legal analysis under the heading "Conclusions of Law."

### I. The Parties

#### A. *Tracinda Corporation*

Tracinda is a holding company incorporated in Nevada with its principal place of business located in Beverly Hills, California. Tracinda is primarily engaged in the business of investing in other companies, particularly companies listed on the New York Stock Exchange. Kerkorian Tr. Vol. B. at 270:12–271:1; Mandekic Tr. Vol. A. 114:17–19. Kirk Kerkorian is the Chairman, Chief Executive Office and sole shareholder of Tracinda. Joint Pretrial Order, Ex. 1 at ¶ 1; DX 1 at ¶ 11. As of May 6, 1998, Tracinda was Chrysler's largest stockholder. Joint Pretrial Order, Ex. 1 at ¶ 1. Based on its line of business and its experience, Tracinda is properly considered a sophisticated investor. *In re DaimlerChrysler AG IV*, 294 F.Supp.2d at 625.

#### B. *DaimlerChrysler AG*

DaimlerChrysler AG ("DaimlerChrysler") was formed in 1998, as a result of the merger between Daimler–Benz and Chrysler (the "Merger"). DaimlerChrysler is a

---

**1.** In both *Tracinda*, 197 F.Supp.2d 42, and *In re DaimlerChrysler I*, 197 F.Supp.2d 86, the Court made other rulings with regard to the Class Plaintiffs which are not relevant here, and therefore the Court will not reiterate those rulings. The Court also notes that Class Plaintiffs have since settled with Defendants.

**2.** The post-trial briefing was completed on May 24, 2004, and electronic formats were submitted as of June 30, 2004. Additionally, on August 3, 2004, Tracinda supplemented its submissions with materials previously omitted from its earlier filings. In sum, the record closed and was submitted for decision as of August 3, 2004.

stock corporation organized under the laws of the Federal Republic of Germany. Joint Pretrial Order, Ex. 1 at ¶ 2. Currently, DaimlerChrysler ordinary shares trade on the New York Stock Exchange under the trading symbol "DCX." *Id.* Daimler-Chrysler shares are also traded on other domestic and foreign stock exchanges. *Id.* Since its formation and continuing to date, DaimlerChrysler has had two headquarters, one in Auburn Hills, Michigan and one in Stuttgart, Germany.

### C. *Daimler–Benz AG*

Prior to the Merger, Daimler–Benz was a stock corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business in Stuttgart, Germany. *Id.* at ¶ 3. Until November 17, 1998, Daimler–Benz was the issuer of American Depository Shares trading on the New York Stock exchange under the trading symbol "DAI." Daimler–Benz also traded ordinary shares on the Frankfurt Stock Exchange. *Id.*

### D. *Chrysler Corporation*

Prior to the Merger, Chrysler was a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Auburn Hills, Michigan. Until November 12, 1998, Chrysler common stock traded on the New York Stock Exchange under the trading symbol "C." *Id.* at ¶ 4.

### E. *Jürgen Schrempp*

Jürgen Schrempp is a citizen of the Federal Republic of Germany. Since November 1998, Schrempp has been a Chairman of the DaimlerChrysler Board of Management. Prior to that time, Schrempp served as Chairman of the Daimler–Benz Board of Management. *Id.* at ¶ 5. Schrempp does not serve and has never served on the Supervisory Board of either DaimlerChrysler or Daimler–Benz.

### F. *Manfred Gentz*

Manfred Gentz is a citizen of the Federal Republic of Germany. Since November 1998, Gentz has been a member of DaimlerChrysler's Management Board. In this capacity, Gentz is responsible for Finance and Controlling. Prior to the Merger, Gentz served in a similar position and capacity on Daimler–Benz's Board of Management. *Id.* at ¶ 6. Gentz does not serve and has never served on the Supervisory Boards of either Daimler–Benz or DaimlerChrysler.

## II. Tracinda's Historical Relationship With Chrysler

Tracinda's interest in Chrysler began when Kerkorian met Lee Iacocca, who was then Chairman of Chrysler, in 1990. Kerkorian Tr. Vol. B. 280:6–12, 314:13–21; DX 24 at 13. Shortly thereafter, Tracinda started investing in Chrysler, acquiring approximately 9.9% of Chrysler's outstanding stock in 1990. Kerkorian Tr. Vol. B. 281:15–17, DX 24 at 12. Two years later, Kerkorian sought representation for Tracinda on the Chrysler Board, and threatened a proxy fight to obtain such representation. DX 24 at 13–14; Kerkorian Tr. Vol. B. 315:8–318:1. In response, Iacocca, his designated successor Robert Eaton and the Chairman of the Nominating Committee of Chrysler's Board of Directors met with Kerkorian. As a result of these discussions, Kerkorian withdrew his request for board representation. DX 24 at 14.

During the next year and a half, Tracinda sought a possible stock split and dividend increase for Chrysler shareholders. To achieve these goals, Tracinda had several discussions with Chrysler, and Kerkorian met with Eaton personally to press for a stock repurchase program. DX 24 at 14; Kerkorian Tr. Vol. B. 319:5–320:5; DX 24 at 14. When Chrysler resisted Tracinda's proposals, Kerkorian issued an ultima-

tum stating: "If, by December 15, the Board has not taken action to redeem the poison pill and to initiate a stock buyback, a stock split and a dividend increase as proposed in this letter, I intend to take all appropriate legal steps to pursue these proposals, including legal action to invalidate the poison pill." DX 24 at 15–16; Kerkorian Tr. Vol. B. 322:2–19, 323:21–324:18. On December 1, 1994, Chrysler took the action requested by Kerkorian and announced a $1 billion share repurchase program and a common stock dividend increase of 60%.

Less than five months later, Kerkorian, assisted by former Chrysler Chairman Iacocca, launched a campaign to acquire all of the outstanding common stock of Chrysler for $55 per share in cash. DXs 96, 123, Kerkorian Tr. Vol. B. 330:3–13. Prior to making a public announcement of its buyout proposal, Tracinda had numerous meetings with Chrysler executives, including Eaton. DX 640, Kerkorian Tr. Vol. B. 345:4–6. The night before Tracinda publicly announced its tender offer, Kerkorian spoke with Eaton by phone. As a result of their conversation, Kerkorian believed that the Chrysler management would not oppose his buyout proposal. Mandekic Tr. Vol. A. 141:3–7; Kerkorian Tr. Vol. B 283:3–9, 345:4–22; 141:6–7. To Kerkorian's surprise, Chrysler publicly rejected the buyout proposal the same day it was announced. DX 22, Mandekic Tr. Vol. A 141:1–7, 19–23. Although Kerkorian relied on what he understood to be Eaton's oral assurance that he would not oppose the buyout, Kerkorian came to wish that he had obtained Eaton's assurance in writing. Kerkorian Tr. Vol. B. 345:25–346:13; Mandekic Tr. Vol. A. 143:15–20. After Chrysler rejected the buyout proposal, Tracinda sought to hire Chrysler's former Chief Financial Officer, Jerome York. DX 25, Kerkorian Tr. Vol. B. 348:23–25. On May 31, 1995, Tracinda abandoned its proposed buyout, because it failed to secure suffi-

cient financing for its offer. Kerkorian Tr. Vol. B. 285:12–21, 362:11–15; DX 24 at 26.

After abandoning its buyout proposal, Tracinda continued to acquire Chrysler shares. Approximately one month later, on June 27, 1995, Tracinda commenced a tender offer to purchase 14,000,000 common shares of Chrysler stock for $50 per share in cash. DX 24. As part of its tender offer, Tracinda disclosed the possibility that it would replace the existing Board of Directors and name a new chairman. DX 24 at 27.

On September 1, 1995, York agreed to become Vice–Chairman of Tracinda. DX 25, 638, 639. During the negotiations leading to York's hiring, Kerkorian discussed with York the possibility that he might replace Eaton as Chairman of Chrysler. Kerkorian Dep. 126:10–12, 19–20; DX 24 at 27. York was hired by Tracinda because of his knowledge of Chrysler and for the experience he brought as former CFO of Chrysler and IBM. Kerkorian Tr. Vol. B. 369:16–370:13, 370:19–24, 373:12–18; Mandekic Tr. Vol. A. 153:9–154:4. As compensation for the services he was to provide to Tracinda, York received an approximately $26 million signing bonus, a salary of $1 million per year and a 6% share of any increases in the value of the Chrysler stock held by Tracinda. According to Tracinda, the estimated value of York's contract was almost $43 million, not including the $26 million signing bonus. DX 723, Mandekic Tr. Vol. A. 152:18–23. Although York is represented by Tracinda's attorneys, Tracinda did not produce York as a witness at trial.

In connection with its efforts to obtain additional share buy-backs and dividends, Tracinda also engaged in a media campaign which included criticism of Chrysler's management. Kerkorian Dep. 143:5–144:6; Kerkorian Tr. Vol. B. 382:2–12. To assist in its media efforts, Tracinda re-

tained the public relations firm of Sard Verbinnen & Co. and allowed York to "lead the charge" against Chrysler. Kerkorian Tr. Vol. B. 390:24–391:9; DX 234; Aljian Dep. 59:10–19. Reporting on Tracinda's media campaign, an article in the October 16, 1995 edition of *Business Week* stated:

As Kerkorian presses his campaign for control of Chrysler, he and his aides are making Eaton and his track record, management style, and strategic vision the central issue. In conversations with reporters and with the powerful institutional investors who will ultimately decide the battle's outcome, they are tarring Eaton as a man more lucky than smart.

DX 235; *see also* Kerkorian Tr. Vol. B. 395:15–397:7. Kerkorian characterized Tracinda's media comments with regard to Eaton and Chrysler's management as "trash talk," which did not reflect his personal feelings. Kerkorian Dep. 144:18–25; Kerkorian Tr. 287:2–12. By October 1995, Tracinda had acquired approximately 13% of Chrysler's common stock and pressed Chrysler to appoint York to its Board of Directors. DX 26. Two months later, on December 28, 1995, Tracinda filed a Proxy Statement with the SEC in connection with a possible insurgent proxy solicitation at Chrysler's annual meeting in 1996. DX 698.

On February 8, 1996, Kerkorian, Tracinda and Chrysler executed a series of agreements to settle the issues that had arisen among them. One of these agreements included the Standstill Agreement by which Chrysler agreed to nominate a Tracinda representative to its Board in exchange for Tracinda agreeing to maintain its level of ownership of Chrysler stock below 13.5%. DX 30; DX 28 at Ex. 1. In addition, Chrysler agreed to initiate stock buy-backs totaling over $2 billion in 1996 and $1 billion in 1997. DX 29, Kerkorian Tr. Vol. B. 385:2–14, 398:20–25. The

Standstill Agreement also bound Tracinda to vote its Chrysler shares on all matters, including proposed mergers, in the same proportion as all other Chrysler shareholders. DX 30 at 5.

Consistent with the terms of the Standstill Agreement, Tracinda's designee, James Aljian, was elected to the Chrysler Board of Directors. Using confidential information obtained from his Board position that was not available to other shareholders, Aljian reported to Kerkorian and York about the goings on at Chrysler. Kerkorian Tr. Vol. B. 399:1–400:3; Kerkorian Dep. 173:2–8, 334:23–335:2; York Dep. 86:16–87:2, 103:12–18, 166:10–22, 240:4–8, 259:25–260:11; Aljian Dep. 31:9–17, 149:12–151:3, 212:8–214:2, 225:5–15, 293:10–300:13. As Kerkorian put it, "with Aljian on the board, it's like Tracinda being on the board, as far as getting information." Kerkorian Dep. 173:6–8; Kerkorian Tr. Vol. B. 399:23–400:3. Indeed, Kerkorian expected Aljian to inform him of anything that was important at Chrysler, and according to Kerkorian, Aljian knew what Kerkorian considered to be important. Kerkorian Tr. Vol. B. 400:4–18; Kerkorian Dep. 335:3–5.

Using confidential information obtained from Aljian, York wrote a memorandum to Kerkorian in May 1997 which criticized Chrysler's spending and its management. Commenting on Chrysler's expenditures, York wrote that Chrysler's spending levels were "truly astronomical," and that its spending plans were a "dangerous way to run things." DX 31 at 2–3. As for Chrysler's management, York wrote that the data from Chrysler's board presentations was "flawed," and that "[i]t is a *dumb* way to prepare a Business Plan." *Id.* (emphasis in original)

About a month after receiving York's memo, Tracinda began discussing the potential reduction of its investment in

Chrysler. In a memo dated June 20, 1997, York noted that Kerkorian asked him to explore this possibility "three weeks ago." York advised Kerkorian that "large blocks of stock generally sell at a discount to market," DX 32 at 2, and Kerkorian understood that the sale of a large block of stock could adversely affect Chrysler's stock price. Kerkorian Dep. 185:7–10. With respect to the issue of providing a rationale for the sale, York wrote:

> In the case of Tracinda, I believe the only explanation that would stand a decent chance of not creating uncertainty in the market would be a statement to the effect that Tracinda is planning to expand its investment in the entertainment sector, and is selling Chrysler to generate liquidity in preparation for such an investment.

DX 32 at 1. Ultimately, Kerkorian decided not to sell a large block of Chrysler shares on the open market. Kerkorian Dep. 180:11–19. In fact, from the time it entered the Standstill Agreement until the Merger, Tracinda sold its Chrysler shares (1) when it was notified by its General Counsel, William O'Brien that the sale was necessary to keep Tracinda in compliance with the Standstill Agreement, PX 174, PX 237, PX 258, PX 950, Kerkorian Tr. Vol. B. 289:6–17, and (2) to reduce its holdings to below 5% prior to the closing of the Merger in order to avoid significant tax consequences. Mandekic Tr. Vol. A. 125:8–126:6.h

## III. Merger Discussions

### A. *Tracinda's Views On A Business Combination For Chrysler*

In addition to the aforementioned discussions concerning its investment in Chrysler, Tracinda also explored the possibility of finding a merger partner or acquiror for Chrysler. To this end, York testified that he had a "long standing" view that there had to be a consolidation in the automotive industry. York Dep. 135:14–25, 139:2–14. York prepared several analyses of candidates that might merge with or acquire Chrysler. However, Tracinda only produced one of these analyses in discovery, and York could not account for the other analyses he prepared. York Dep. 135:3–9, 142:2–22. In the one analysis produced, Tracinda concluded that a business combination between Chrysler and Daimler–Benz was "attractive" and that Daimler–Benz was the "best fit" to combine with Chrysler. Kerkorian Tr. Vol. B. 414:23–415:1; York Dep. 146:7–154:18, DX 33.

From the outset, Kerkorian was enthused about the possibility of a combination between Daimler–Benz and Chrysler, because Daimler–Benz was a world-wide company and the potential synergies could result in a combination where "two and two make five." Kerkorian Tr. Vol. B 417:21–418:2, 419:3–10; Kerkorian Dep. 194:18–195:4. Kerkorian approached Eaton to share his thoughts about a potential business combination between Daimler–Benz and Chrysler. At the time, Kerkorian had no idea whether the transaction should be a merger or an acquisition. Kerkorian Tr. Vol. B. 420:10–15, Kerkorian Dep. 192:10–194:4, 196:7–197:2. Upon raising the issue with Eaton, Kerkorian learned that Eaton had already spoken with Schrempp, Chairman of Daimler–Benz's Management Board, about a potential transaction between the companies. Kerkorian Dep. 196:13–16, 196:23–197:2. When Kerkorian returned to Tracinda, he instructed York and Aljian to "stay close" to the potential Chrysler Daimler–Benz combination. As a result, York began preparing further studies of a potential transaction. DXs 34–38.

As a member of the Chrysler Board of Directors, Aljian was briefed on the discussions between Schrempp and Eaton on February 5, 1998. DX 20 at 50. Like

Kerkorian, Aljian was an enthusiastic supporter of the Merger, and Aljian kept Tracinda apprised of developments regarding the Merger. DX 42; Wilson Tr. Vol. H. 1714:20–1715:2; York Dep. 166:10–22.

Continuing his analysis of the combined value of Chrysler and Daimler–Benz, York prepared a memo on February 16, 1998. In that memo, York wrote, "[t]he valuation potential [of a Chrysler Daimler–Benz combination] is so great that nothing should stand in the way of a complete board evaluation of this possible combination." York also wrote that *"the* key issue" to obtaining this value was the "P/E multiple of [the] combined entity." DX 34 at Y 58 (emphasis in original); York Dep. 173:2–9, 176:16–177:8. York advised Kerkorian that such a combination could result in immediate gains for Chrysler in the range of $646 million to $2.668 billion, depending on where the merged company's initial P/E ratio fell in a range between 12 and 18 billion, with an ultimate gain between $1.8 and $4.4 billion. At the time York wrote his memo, he had no information about the nature or structure of the transaction being considered. In fact, York's analysis assumed that the transaction would be in the nature of a purchase, which would be the case in an acquisition. DX 34 at Y 58.

Before any detailed proposals for the Merger were presented to the Chrysler Board, York prepared a memo on March 4, 1998, to Kerkorian and Aljian describing: (1) "the key points supporting the rationale for a merger," (2) "the strategic aspects concerning the combination," and (3) "the relevant numbers." DX 35 at cover page (T008812). Discussing the current posture of Chrysler, York first observed that there was "[n]othing to propel Chrysler stand-alone to higher level." York then summarized the problems and risks Chrysler faced:

No opportunity for substantial cost reductions.

No new minivan to invent.

No new Jeep to purchase.

No new pick-up opportunity.

Auto industry cycle now mature.

Incentive costs spiraling upward.

Chrysler earnings under pressure.

Chrysler international sales shrinking, not expanding.

Institutional disinvesting in Chrysler on a net basis. Any economic or market decline likely to be worse for Chrysler:

 Cyclical stock.

 Risk to share repurchase.

 Regional producer.

Regulatory risks are huge for Chrysler:

 Higher fuel economy for Jeeps, minivans, and pick-ups.

 Safety standard for Jeeps, minivans, and pick-ups.

DX 35 at 1 (T00813). In conclusion, York stated, the "[s]ituation is compelling to do the merger," and *"[n]ow* is the time to do it, b[e]fore the Chrysler-specific risks materialize." *Id.* (emphasis in original). In this regard, York testified, that the idea was to "sell the home before the termites attack the floor beams." York Dep. 193:9–14. York also wrote that "no conceivable Chrysler standalone plan can achieve the value of the synergies of a merger." DX 35 at 1 (T8813). During his deposition testimony, Aljian described this memo as "show[ing] the basis of the benefit of the merger." Aljian Dep. 201:11–13. York also stated that the memo included all the reasons he could think of as to why the Merger could produce "huge value" for the shareholders. York Dep. 190:6–17. York also testified that he solicited advice from a friend at Deloitte & Touche during this time frame concerning the feasibility of a German company acquiring a United

States corporation in a tax-free transaction. DX 104; York Dep. 200:4–18.

Two days later, York prepared another memo dated March 6, 1998, in response to Kerkorian's question about whether Eaton had enough incentives to make sure he accomplished the transaction with Daimler–Benz. York Dep. 197:20–199:7, DX 36. In his memo, York reported to Kerkorian that Eaton would receive "north of 110 million—or a lot of incentive for him to get the deal done." DX 36; Kerkorian Tr. Vol. B. 444:21–445:7. As a director of Chrysler, Aljian was aware of Eaton's stake in the transaction, as well as the stakes of other members in senior management, and these interests were disclosed publicly to the Chrysler shareholders prior to their vote on the Merger. DX 20 at 68.

One week before Chrysler's Board of Directors approved the Merger, York created a three-page document entitled "Cleveland/Denver Key Issues." This document was dated April 30, 1998, and reflected the views of York, Aljian and Richard Sobelle, Tracinda's in-house general counsel, regarding the Merger. During his deposition testimony and on cross-examination at trial, Kerkorian stated that he could not recall any other merger-related issues that were important to him, other than the issues laid out in this memo. Kerkorian Dep. 233:21–235:21, Kerkorian Tr. Vol. C. 629:8–630:3. Specifically, those issues were (1) that Tracinda would have to sell shares down to a certain percentage, (2) the transaction would be tax-free, (3) the timing of the transaction, and (4) the price. Kerkorian Dep. 234:18–235:21.

As for governance structure, Kerkorian supported the Merger before he had any discussions with anyone about corporate governance. Kerkorian never expressed any interest in the composition of the DaimlerChrysler Management Board to Eaton, and none of Tracinda's analyses discuss the desire or need to preserve Chrysler's existing management. At his deposition, Kerkorian testified that he would not have been concerned if Schrempp named a management team for the new company that left control firmly in the hands of the former Daimler executives. Kerkorian Dep. 349:18–22. York also testified at his deposition that he believed that the "high level strategic benefits to the shareholders" were more important to investors than the "internal plumbing and nuts and bolts" of who was on the company's new boards. York Dep. 269:12–24.

In a memo prepared by Aljian to Kerkorian referred to by Aljian as the "deal memo," Aljian noted that the Merger was to be a "merger of equals." Aljian also noted that the Supervisory Board of the new company would be "all outside directors—10 LABOR, 5C and 5D." DX 107 at T 1921. With respect to the Supervisory Board, Aljian stated, "They appoint management, set their composition, major transactions such as this deal and social issues." *Id.* Aljian and Kerkorian understood that the Supervisory Board was to be "the principal board" at DaimlerChrysler. Aljian Dep. 254:10–11, Kerkorian Dep. 49:25–50:5. Aljian also noted in his memo that an "Integration Board" is the board that would "act as an American board would perform but in an advisory way." DX 107 at T 001921. Aljian noted that this was the board that he was committed to be on. During his deposition testimony, Aljian said that he believed Tracinda was entitled to representation on the principal board of the Company, that being the Supervisory Board. Aljian also testified that he felt that it was an affront to a major shareholder that he was placed on the Integration Board, rather than the Supervisory Board. Aljian Dep. 253:11–13, 254:8–19.

By May 1998, Chrysler's Board, including Aljian, had met at least seven times to discuss the progress of the Merger negotiations. The Board received advice from its financial advisors, and its German and American attorneys. The Board also gave input regarding the further conduct of the negotiations. DX 20 at 47–49, Wilson Tr. Vol. H. 1711:5–1712:22, Lanigan Tr. Vol. I 2003:11–23, Schrempp Vol. K 2182:11–14, Valade Tr. Vol. L 2380:17–2381:12. Aljian was an active participant at these meetings and updated York whenever he got new information. York Dep. 166:10–22. As Tracinda stated in its press release materials, "We have been kept informed of the status [of the merger negotiations] by virtue of our board representation since February, and provided periodic input, including indicating our strong support." DX 42.

B. *Kerkorian's Discussions With Eaton Concerning The Merger*

During this time frame, Kerkorian also discussed the Merger with Eaton, but their discussions were on a general level. Kerkorian understood that the details about the Merger would eventually be incorporated into the Business Combination Agreement ("BCA") and that a detailed proposal for effectuating the merger of equals would be presented to the Chrysler Board in early May 1998. DX 1 at ¶ 19, Kerkorian Tr. Vol. C. 647:24–648:4, 649:1–11. As for his conversations with Eaton, Kerkorian could not remember how many conversations he had with him prior to the Merger announcement, and couldn't recall any specifics of conversations he had with Eaton after his initial conversation with Eaton during which he raised the idea of a transaction between Daimler–Benz and Chrysler. Kerkorian Dep. 205:6–16, 218:21–25, 219:7–9. Kerkorian acknowledged that he and Eaton "didn't get into [the manner in which the Merger would be implemented] much." Kerkorian Dep.

225:9–11. Eaton also testified that his conversations with Kerkorian were "reasonably general" and not on a very "deep level." Eaton Tr. Vol. D. 762:11–23. Eaton did not discuss with Kerkorian the different boards for a German company and how they worked. Kerkorian Tr. Vol. B. 294:21–24. Although Eaton advised Kerkorian that he intended to retire after three years of serving as co-chairman with Schrempp, Eaton did not represent that Daimler–Chrysler would name a replacement co-chairman after he left, and Eaton did not indicate that Holden would assume a co-chairmanship position. PX 538, Eaton Tr. Vol. D 859:7–860:4, Stallkamp Vol. I 1981:19–24. During his deposition testimony, York stated that he understood that Schrempp would be the sole Chairman of DaimlerChrysler's Management Board once Eaton retired. York Dep. 251:22–24. York also stated that he "had long felt . . . that co-CEO arrangements in general don't tend to work out very well." York Dep. 253:17–25. None of what Eaton said to Kerkorian was said at the direction of Schrempp . or anyone else at Daimler–Benz, and Eaton did not report to Schrempp the details of any conversations he had with Kerkorian. Eaton Tr. Vol. D. 861:5–11, Eaton Dep. 91:5–16; Schrempp. Dep. 237:9–240:24.

C. *Tracinda Enters Into The Stockholder Agreement*

Simultaneously with the execution of the BCA and well-before Chrysler issued the Proxy/Prospectus, Tracinda, Kerkorian, Chrysler and Daimler–Benz entered into the Stockholder Agreement on May 6, 1998, which obligated Tracinda to vote its shares in favor of the Merger. DX 108, DX 43 at T 248–249, § 1.1, Kerkorian Tr. Vol. B 298:8–10. Daimler–Benz's largest shareholder, Duetsche Bank, entered into a similar agreement to support the Merger. Eaton Tr. Vol. D. 881:23–882:7,

Schrempp Tr. Vol. G. 1487:4–17. The Stockholder Agreement was negotiated at arm's length, and Tracinda was advised by its in-house counsel and by the law firm of Fried, Frank, Harris, Shriver & Jacobson. Aljian Dep. 245:18–247:9, York Dep. 223:19–224:18, 237:24, 238:4. Tracinda's lawyers and officers reviewed the BCA before signing the Stockholder Agreement to make sure that it reflected everything Tracinda wanted and expected from the Merger, and Tracinda's attorneys advised Kerkorian that the BCA was consistent with what Kerkorian told them he expected. Kerkorian Tr. C. 649:1–11, 652:10–15; Mandekic Tr. Vol. A. 120:15–121:1, 124:14–23, 160:9–29, 165:7–18; Aljian Dep. 245:18–246, DX 39.

Daimler–Benz wanted Tracinda's commitment to the Merger through the Stockholder Agreement; however, the Stockholder Agreement was not a prerequisite to the Chrysler Board's approval of the transaction. While Eaton and the Chrysler Board wanted Tracinda's approval, they did not tell Kerkorian that his approval was a prerequisite to the Board's approval of the Transaction, Eaton Tr. Vol. D. 765:8–10, 860:19–25; Wilson Tr. Vol. H. 1717:4–20, and members of the Chrysler Board of Directors testified that they would have approved the Merger even if Tracinda had not supported it. PX 967 at ¶ 5, PX 968 at ¶ 9, Wilson Vol. H. 1716:23–1717:3, Lanigan Tr. Vol. I.2060:16–2061:16. Without the execution of the Stockholder Agreement, Tracinda would have been bound by the Standstill Agreement to vote its shares in the same proportion as that of other Chrysler shareholders. DX 30 at 5.

Substantively, the Stockholder Agreement did not use the term "merger of equals" and contained no representations concerning corporate governance. DX 43 at T 248–252, Kerkorian Dep. 260:2–261:3. However, the Stockholder Agreement did refer to the BCA. In addition, the Stockholder Agreement and the BCA both contained integration clauses indicating that the written agreements superseded all oral or other written understandings between the parties. DX 43 at T250, § 4.3, DX 20 at A–42, § 4.3. During his deposition, Kerkorian testified that he executed the Stockholder Agreement, because he believed the BCA fully reflected and effectuated the merger of equals. Kerkorian Dep. 226:2–12.

### D. Daimler–Benz's Preliminary Views Regarding A Business Combination

At nearly the same time that Tracinda was analyzing the possibility of a merger partner or acquiror for Chrysler, Daimler–Benz was also analyzing the possibility of partnering with another company. Daimler–Benz rejected potential partnerships with General Motors, Ford and Toyota, because it was concerned that Daimler–Benz would take a junior partner role in such a combination. Schrempp Tr. Vol. H. 1574:12–21, 1575:9–11, 1575:21–25. Daimler–Benz considered a possible combination with Chrysler, because Chrysler had a good market position with strong earnings that would permit comprehensive global business expansion, while maintaining the brand identity of Mercedes–Benz. Schrempp Tr. Vol. H. 1575:12–10, 1576:1–8.

In August or September 1995, Schrempp and Eckhard Cordes, then head of strategic planning at Daimler–Benz, commissioned Alexander Dibelius of Goldman, Sachs & Co. oHG ("Goldman Sachs") to analyze a combination with Chrysler. PX 544 at ¶ 2; Dibelius Dep. 29:3–21, 130:7–23. Goldman Sachs' 1995 study was code named "Project Blitz" and considered, among other things, a potential acquisition of Chrysler. PX 544 at 3–4.

During this time, Daimler–Benz was structured as a holding Company. Schrempp was Chairman of that holding company, and Mercedes–Benz was an AG with its own Management Board. The head of the Management Board of Mercedes–Benz AG contacted Chrysler about the possibility of a combination, but the idea was eventually abandoned as too complex. Schrempp Tr. Vol. F. 1223:12–1224:18

Defendants also consulted with others concerning the possibility of acquiring Chrysler. In the Spring of 1997, Defendants consulted with Ernst Stoeckl of TransAtlantic Consulting. The study prepared by TransAtlantic Consulting was code named "Project Dutch Boy" with Chrysler being referred to as "Christian" and Daimler–Benz being referred to as "Dutch Boys." PX 27; PX 32; PX 34; Cordes Dep. 32:23–34:22. Daimler–Benz also spoke with Ruggero Maggnoni of Lehman Brothers about an acquisition of Chrysler. Schrempp Tr. Vol. G. 1482:10–20; Cordes Dep. 75:22–76:12; PX 37 at DCX 0183137. Project Blitz was also updated periodically, particularly after talks with Chrysler began. PX 45; PX 544 at ¶ 8–9.

## IV. The Daimler–Benz and Chrysler Negotiations

Discussions between Chrysler and Daimler–Benz began in the fall of 1997, at the Frankfurt Motor Show. At that time, Schrempp spoke to Bob Lutz, then president of Chrysler, about the possibility of Chrysler and Daimler–Benz talking again about a business combination. Schrempp Tr. Vol. F. 1233:19–1234:19. Lutz suggested that Schrempp speak with Eaton. *Id.* at 1234:20–22. Schrempp had his office arrange for a meeting with Eaton during the Detroit Motor Show. On January 12, 1998, Schrempp and Eaton met at Eaton's office in Auburn Hills. Schrempp Tr. Vol. F. 1237:2–7. The meeting was short and polite, and Schrempp discussed with Eaton his thoughts about the likelihood of a consolidation in the world-wide automotive industry. Joint Pretrial Order, Ex. 1 at ¶ 7. Schrempp suggested that it might be beneficial if Daimler and Chrysler were to consider the possibility of a business combination. *Id.* At trial, Schrempp testified that he was personally against "unfriendly action" toward a company in terms of "attacking a company." Schrempp Tr. Vol. F. 1236:8–10. During the meeting, Eaton told Schrempp that Chrysler was also doing studies and watching the world-wide situation. Schrempp Tr. Vol. F. 1237:22–23. Eaton indicated that he needed some time to consider the idea and told Schrempp he would get back to him. Schrempp Tr. Vol. F. 1237:2–25. Eaton called Schrempp at the end of January of 1998 to further their discussions.

Schrempp and Eaton met again on February 12, 1998, in Geneva. Gary Valade, then CFO of Chrysler and Cordes who was responsible for Corporate planning and M & A at Daimler also attended the meeting. Schrempp Tr. Vol. F. 1238:10–14, Valade Tr. Vol. A. 176:19–177:1 (deposition excerpt); PX 277 at SC0000650. Valade's notes indicate that Schrempp said that "We only want to consider a true merger, one management, one team, one Board" and "One board—One Management is the key." PX 980 at DCX243217–243218; Schrempp Tr. Vol. K. 2129:10–25. According to Valade, the parties did not use the term "merger of equals," but the parties contemplated a significant role for both management teams in any combined entity. Valade Tr. Vol. A. 177:10–22 (deposition excerpt). Valade also testified that, in addition to "a significant or an appropriate role for [Chrysler's] management in the new company," Eaton was also interested in a premium for Chrysler shareholders. *Id.* at 177:10–13. The role of management was discussed at subse-

quent meetings, and eventually the term "merger of equals" was used to describe the transaction. *See, e.g.,* PX 987 at 3; Valade Tr. Vol. L. 2557:1–2559:2; Schrempp Tr. Vol. K. 2186:3–2187:6. The parties' negotiations also included debate concerning the corporate form, i.e. whether the new company should be a German AG, a U.S. corporation or a third alternative. *See, e.g.,* Schrempp Tr. Vol. K. 2138:24–2139:7, Vol. G. 1452:16–1453:2; Eaton Tr. Vol. D. 771:11–772:24; Wilson Tr. Vol. H. 1711:19–1712:3; Valade Tr. Vol. K. 2371:1–7. In addition, the parties discussed the exchange ratio for shareholders, and the compensation and stock options for Chrysler's management. *See, e.g.,* Valade Tr. Vol. L. 2386:16–2397:16; PX 998 at DCX 243250–243251; Schrempp Tr. Vol. F. 1243:23–1244:22, 1246:19–1248:10, 1251:4–11; Cordes Dep. 142:4–143:22, 156:16–24; Eaton Dep. 69:3–70:21.

From January 1998 until May 7, 1998, when the BCA was signed, Chrysler and Daimler–Benz conducted extensive arm's length negotiations. Chrysler and Daimler–Benz were each assisted by their own independent lawyers, investment bankers and accountants. Eaton Tr. Vol. D. 771:19–772:1, Schrempp Vol. F. 1240:17–19, 1243:15–21, Vol. G. 1525:19–22, Wilson Tr. Vol. H. 1711:5–14, Lanigan Tr. Vol. I.2003:11–22, Valade Tr. Vol. K. 2371:1–7. Gentz was not a participant in the Merger negotiations with Chrysler, Schrempp Tr. Vol. G. 1460:15–17, Gentz Tr. Vol. K. 2299:6–15 (deposition excerpt), and was not made aware of the negotiations until late April 1998. Cordes Dep. 172:23–173:6.

Both Chrysler and Daimler–Benz believed each was negotiating from a position of financial strength, and each made it a point to express this view in public interviews and meetings. Schrempp Tr. Vol. H. 1576:14–1577:7; Eaton Tr. Vol. D. 729:20–730:15; PX 157 at DCX 0157860, PX 177 at DCX 0001740, PX 316 at DCX

0036132–33. Schrempp and Eaton also believed, as York had independently concluded on behalf of Tracinda, that there was going to be a consolidation in the automotive industry leaving the strongest companies with the best chances for survival. Eaton Tr. Vol. D. 727:23–723:3; Schrempp Tr. Vol. H. 1573:6–16; Eaton Dep. 14:11–21.

## V. The Chrysler Board Approves The Merger

As the merger negotiations between Chrysler and Daimler–Benz progressed, the Chrysler Board was regularly kept apprised. DX 20 at 47–49. Like Schrempp, Eaton and York, the Chrysler Board and other executives at Chrysler also believed that the automotive industry was moving toward a consolidation, Stallkamp Tr. Vol. I.1987:13–15, 2001:1–10, 2075:20–2076:7, Wilson Dep. 13:16–14:21. Indeed, this commonly shared view eventually became one of the reasons Chrysler's directors recommended the transaction to Chrysler's shareholders. DX 20 at 50.

In addition to this factor, the Chrysler Board also considered other aspects of the Merger in making its decision, including but not limited to, the "merger of equals" structure and the value to their shareholders. *Id.* The Chrysler Board was advised by its outside attorneys, and was informed that as a result of the contemplated transaction "no one person or group of persons would control the combined company or be in a position by itself to block the sale of the combined company." DX 549 at T5846.

With respect to the value the Chrysler shareholders were to receive, the Chrysler Board received a fairness opinion by Credit Suisse First Boston ("CSFB"). CSFB analyzed the Merger as a strategic business combination not involving a sale or

change in control and opined that the Merger was fair to Chrysler stockholders from a financial point of view. In making this determination, CSFB compared the Merger to sixteen announced or completed transactions which it viewed as comparable. PX 146 at T5845–5846, DX 20 at 57. For each precedent "merger of equals" transaction, CSFB listed one company as the "acquiror" and one company as the "target." DX 140 at DCX 26457. CSFB also noted that the distribution of seats on the combined company's boards was not always equal between the acquiror and the target. *Id.*

On May 6, 1998, the Chrysler Board of Directors unanimously approved the Merger and recommended that the Chrysler stockholders do the same. DX 550. Also on May 6, the Chrysler Board approved amending the employment agreements of Eaton, Valade and Stallkamp to add two events giving rise to "good reason" for those executives to terminate their employment. These additions were a breach or other failure of Daimler–Chrysler, Daimler–Benz, or Chrysler to perform any of the covenants or agreements set out in Article IV or VIII of the BCA or the May 7, 1998 letter agreement between Chrysler and Daimler–Benz with respect to corporate governance. PX 148 at T005857–58; PX 960.

Following the Chrysler Board's approval, Daimler–Benz, Chrysler and DaimlerChrysler signed the BCA which memorialized their agreements. DX 20 at 49. The BCA, dated May 7, 1998, was signed late in the evening of May 6, 1998, and filed with the SEC on May 8, 1998. Joint Pretrial Order, Ex. 1 at ¶ 10. The BCA was later amended and restated as of July 31, 1998, and included in the Proxy/Prospectus filed with the SEC on August 6, 1998. *Id.*; DX 20 at 50, T 153.

In a televised trans-Atlantic press conference originating in London, Chrysler and Daimler–Benz formally announced the Merger on May 7, 1998. Joint Pretrial Order, Ex. 1 at ¶ 11. During that press conference, Eaton publicly announced that he would retire before Schrempp. DXs 276, 280, 324. Also on May 7, 1998, Tracinda issued a press release announcing its support for the Merger. The Press Release said nothing about a "merger of equals" and it did not mention corporate governance or structure of the merged company. DX 47.

## VI. Shareholder Approval Is Sought: The Proxy/Prospectus

Following the Merger announcement, the Proxy/Prospectus was prepared and approved by Chrysler's directors. The Proxy/Prospectus was filed with the SEC on August 6, 1998, and mailed to Chrysler's shareholders with a cover letter from Eaton to seek their approval for the transactions contemplated by the BCA. DX 20; Joint Pretrial Order, Ex. 1 at ¶ 13. The Proxy/Prospectus was also furnished to Daimler–Benz shareholders in the United States. DX 20 at 2 (T 000005), 8 (000017). The Proxy/Prospectus included four annexes: (1) the BCA, (2) the Opinion of CSFB, (3) an English translation of the opinion of Goldman, Sachs & Co. oHG, and (4) an English translation of the Articles of Association (Satzung) of DaimlerChrysler AG. Joint Pretrial Order, Ex. 1 at ¶ 13, DX 20. In bold face type, the Proxy/Prospectus contained a clause disclaiming reliance on representations not contained in the Proxy/Prospectus Statement. DX 20 at 5 (bold type in original).

The Proxy/Prospectus described in detail the terms of the proposed transaction. It disclosed that upon consummation of the transaction, "Chrysler will become a wholly owned subsidiary of DaimlerChrysler AG and Daimler–Benz will be merged with and into DaimlerChrysler AG, with Daim-

lerChrysler AG remaining as the surviving entity." DX 20 at 11. The Proxy/Prospectus explained that DaimlerChrysler would have two "operational headquarters" one located in Auburn Hills, Michigan, and one in Stuttgart, Germany, and that the official language of DaimlerChrysler AG would be English. DX 20 at A–17, Schrempp Vol. F 1266:25–1267:9. The Proxy/Prospectus also disclosed that the merged entity would be formed under German law and governed by the laws of Germany. DX 20 at T 10, 139–151. To highlight the differences between a German AG and a United States corporation, the Proxy/Prospectus contained twelve pages detailing the differences between shareholder rights under Delaware law, which governed Chrysler, and shareholder rights under German law governing the new company. Id. at 130–141 (T139–150). The Proxy/Prospectus also disclosed that the parties considered three options for the place of incorporation of the merged entity, Germany, the United States, and Holland, but that Germany was eventually selected because of its tax advantages.

As for corporate governance, the Proxy/Prospectus reiterated the terms of the BCA, noting that the compositions for the Board were initial compositions which were to be recommended by Daimler–Benz and Chrysler and subject to the powers and rights of the DaimlerChrysler shareholders, Supervisory Board and Management Board. DX 20 at A–16. Specifically, the Proxy/Prospectus provided that Chrysler and Daimler–Benz would recommend that:

(1) for at least two years following consummation of the Merger, the current chairman of the Daimler–Benz Supervisory Board would continue as Chairman of the DaimlerChrysler Supervisory Board;

(2) upon consummation of the Merger, the DaimlerChrysler Supervisory Board would consist of twenty members with five shareholder representatives recommended by Daimler–Benz and five recommended by Chrysler along with ten labor representatives;

(3) upon consummation of the Merger, the "DaimlerChrysler Management Board shall *initially* consist of 18 members. In general, 50 percent of such members would be designated by Chrysler and 50 percent by Daimler–Benz, and there will be two additional members responsible for Daimler–Benz' non-automotive businesses." DX 20 at 16–17. In addition, the Proxy/Prospectus and the BCA disclosed the formation of the Integration Committee, which later became known as the Shareholder Committee. DX 20 at A–17, Schrempp Tr. 1402:8–18, Wilson Tr. 1700:8–11, 1700:16–19. The Integration Committee was described as having a "consultative function" and would consist of the Co–Chairmen, and 12 or more members (including the co-chairmen), "50% of which shall be designated by Chrysler and 50% of which shall be designated by Daimler–Benz." DX 20 at A–17. The Proxy/Prospectus also reiterated Eaton's previous public announcement that he intended to retire from his position as Co–CEO and Co–Chairman of DaimlerChrysler after three years. In a standalone paragraph under the heading "Governance of DaimlerChrysler AG Following the Chrysler Merger," the Proxy/Prospectus disclosed that the BCA "contains no provision that would bar governance changes after the [DaimlerChrysler] Transactions have been consummated." DX 20 at 16–17.

With respect to the term "merger of equals," the Proxy/Prospectus uses the term at least 13 times, but it is not expressly defined. The term "merger of equals" is first used as a broad description of the characteristics of the combination of the various constituencies of Daimler–Benz

and Chrysler. This use of the term "merger of equals" is exemplified in Eaton's cover letter, which refers to "two companies of equal financial strength under joint leadership of both management groups with its common equity about evenly split between the two shareholder groups." DX 20 at T 1. The term "merger of equals" is next used to refer to the specific governance structure for Daimler-Chrysler following the Merger. When used in this manner, the term "merger of equals" refers to that which is provided for in the BCA. *Id.* at 16, 51. This usage of the term appears for the first time under the caption "Governance of DaimlerChrysler AG Following The Chrysler Merger." As used here, the Proxy/Prospectus states that the governance structure "reflect[s] that the Transactions contemplate a 'merger of equals.'" *Id.* at 16; *see also id.* at 93. The next sentence elaborates on the referenced "merger of equals" by reciting almost verbatim the provisions of the BCA. *Id.* at 16–17; *see also id.* at 93–94. This description is followed by the cautionary language that the BCA does not bar governance changes after the Transactions. *Id.* at 17.

The term "merger of equals" is also used in the context of the CSFB fairness opinion. In this regard, the term is used not only to refer to the Transactions contemplated by the BCA, but also to refer to "a strategic business combination not involving a sale of control" which includes precedent "merger of equals" transactions some of which involved equal representation from the constituent companies in the combined company's post-merger governance, and some of which did not. *Id.* at 57.

After reviewing the draft Proxy/Prospectus, the SEC sought clarification of the meaning of the term "merger of equals." PX 227 at DCX 76402. In response, outside counsel for Chrysler and Daimler–Benz referred the SEC to the second paragraph in Eaton's cover letter to the Chrysler shareholders. PX 243 at T2454.

The Proxy/Prospectus also disclosed numerous risks related to the Merger, including "the difficulties inherent in integrating two large enterprises with geographically dispersed operations, incorporated in different countries." DX 20 at 52, 24. The Proxy/Prospectus pointed out that in these circumstances, "[t]here can be no assurance that this integration, and the synergies expected from that integration, will be achieved as rapidly or to the extent currently anticipated." *Id.* at 24.

The Proxy/Prospectus and the BCA also disclosed the interests of Chrysler executives in the Transactions. These interests included the right to receive substantial sums of DaimlerChrysler stock upon closing worth millions of dollars and substantial cash payments. PX 277 at SC 0000671. The BCA also disclosed that "if the employment of Chrysler's executive officers were terminated within two years after the Chrysler Merger, such persons would receive an estimated lump sum severance payment in the amount of $24,435,997 for Mr. Eaton, $5,487,445 for Mr. Stallkamp, [and] $4,601,383 for Mr. Valade . . . ." PX 277 at SC 0000672.

At his deposition, which he confirmed at trial, Kerkorian testified that he did not get into the specifics of the Proxy/Prospectus because he had already approved the Merger. Kerkorian Dep. 279:8–14, Kerkorian Tr. Vol. C. 663:4–665:1. Kerkorian and York did not read much of the Proxy/Prospectus and testified that Mandekic was responsible for reviewing the document and briefing Kerkorian. Mandekic realized that the composition of the Management Board was an initial composition which could change, and was aware of

the language on page 17 of the Proxy/Prospectus that the BCA did not bar changes to the corporate governance structure. However, Mandekic testified that he did not place significance on the provisions and did not bring them to Kerkorian's attention. Mandekic Tr. Vol. A. 126:7–11, 171:6–25, 172:1–13, 166:18–167:13. From the time the Merger was announced until it closed in November, Aljian sent Kerkorian at least seven memos, none of which mentioned the post-merger management of the new company. DXs 84–90.

After the Proxy/Prospectus was issued to the shareholders, Eaton and Defendants engaged in a media campaign to promote the Merger that was disclosed in the BCA and the Proxy/Prospectus in an attempt to gain the support of Chrysler's shareholders. Press releases were issued, and Schrempp and Eaton held a series of press conferences. *See, e.g.,* PX 159 at DCX 44763–64; PX 165; PX 156; PX 159; PX 338; Schrempp Tr. Vol. G. 1472:15–22, 1595:1–9; Eaton Tr. Vol. D. 816:24–817:17. Both Schrempp and Eaton were aware of the need to have the public understand that the Merger was a "merger of equals." Stallkamp Tr. Vol. I.1905:15–1906:15; PX 186 at DCX0045679; PX 218 AT DCX 0058036. Outside consultants were also hired to assist in this effort. PX 265.

At the same time, Schrempp also engaged his shareholders in publicity efforts intended to foster their support for the Merger. For example, Schrempp gave a speech to Daimler–Benz shareholders in which he stated, "one thing is for certain: our proud company, Daimler–Benz, will not become the subject of decisions of others." PX 308 at DCX 0007501; Schrempp Tr. 1434:18–1439:11.

## VII. The Formation Of DaimlerChrysler

On September 18, 1998, Chrysler held a special meeting of its shareholders to vote on the transaction. DX 20 at T1; Joint Pretrial Order, Ex. 1 at ¶ 14. Chrysler shareholders voted overwhelmingly, by 97% of the votes cast, to approve the Merger. *Id.* at ¶ 15; DX 1 at ¶ 28.

The Merger closed on November 12, 1998, and DaimlerChrysler global shares were traded for the first time on November 17, 1998. Joint Pretrial Order, Ex. 1 at ¶ 16. As a result of the Merger, all shareholders of Chrysler and all shareholders of Daimler–Benz became shareholders of the new company, DaimlerChrysler. Eaton Tr. Vol. D 863:21–864:2; DX 20 at T5. Chrysler's shareholders received approximately 42% of DaimlerChrysler's outstanding shares and Daimler–Benz shareholders received approximately 58% of those shares. DX 20 at T 5. The Merger closed consistent with the provisions in the BCA. Tracinda's Aljian and Kerkorian acknowledged that the provisions of the BCA were satisfied at closing. Kerkorian Dep. 226:2–12, 272:9–12; Aljian Dep. 326:5–330:5.

### A. *The Supervisory Board*

In accord with German law and the provisions of the BCA and Proxy/Prospectus, DaimlerChrysler has a two tier system consisting of a Supervisory Board and a Management Board. The capital members of the Supervisory Board are elected by the shareholders. DX 20 at 132; Buxbaum Tr. Vol. H. 1619:25–1620:4. In addition to shareholder representatives, the Supervisory Board also has labor representatives. *Id.;* Buxbaum Tr. Vol. H. 1615:6–9. In the event of a tie between the shareholder and labor votes, the Chair of the Supervisory Board, who represents the shareholders, breaks the tie. *Id.;* Buxbaum Tr. Vol. H. 1694:18–1695:7. The Supervisory Board appoints and removes members of the Management Board, oversees the management of the company, and

is ultimately responsible for significant corporate transactions like major asset sales and acquisitions. Buxbaum Tr. Vol. H. 1618:3–24, 1623:19–1624:8, 1615:10–1616:24.

From the time the Merger was completed, through and including November 27, 2000, half of the shareholder representatives on the DaimlerChrysler Supervisory Board were those originally designated by Chrysler and half of the shareholder representatives were those originally designated by Daimler–Benz. Schrempp Tr. Vol. F 1215:17–22; Wilson Tr. Vol. H. 1720:9–1721:12; Valade Tr. Vol. L 2459:6–10; PX 968 at ¶ 8, 11. The Chrysler designees were five former outside directors of Chrysler: (1) Robert E. Allen, former Chairman/CEO of AT & T, (2) Robert J. Lanigan, former Chairman/CEO of Owens–Illinois, Inc., (3) Lynton R. Wilson, Chairman of BCE, Inc., (4) Peter A. Magowan, Chairman of Safeway, Inc. and President/Managing General Partner of the San Francisco Giants, and (5) G. Richard Thoman, COO of Xerox Corporation. DX 141.

### B. *The Board of Management*

In contrast to the Supervisory Board, the Management Board manages the daily operations of the company. As stated in the BCA and the Proxy/Prospectus, the DaimlerChrysler Management Board initially consisted of 18 members, ten of whom were designated by Daimler–Benz, including two who were responsible for Daimler–Benz's non-automotive business, and eight of whom were designated by Chrysler. There were no "non-voting" members of the Management Board. Schrempp Tr. Vol. F. 5–13; Valade Tr. Vol. L. 2406:14–17. The Management Board did not take formal votes, but acted by consensus and then reported the results of their discussions and their suggestions to the Supervisory Board. Holden Tr. Vol.

C. 576:23–577:5, 590:20–23; Valade Tr. Vol. L. 2406:5–13.

The Management Board functions as a board of equals with collective responsibility for the operations of the company. The operation responsibilities of Management Board members, as executives, were kept separate from the operations of the entire company. Stallkamp Vol. I 1852:15–23. In this way, Management Board members would report to other individuals in connection with their respective operational responsibilities. For example, Holden, in his role as Executive Vice President for Chrysler Sales and Marketing reported to Stallkamp, the President of DaimlerChrysler corporation. Holden Tr. Vol. C. 577:12–578:9. Holden also had responsibility for daily operations of Mercedes–Benz passenger cars in Canada, the U.S. and Mexico. Although Holden kept Stallkamp informed about these issues, he communicated more with Jurgen Hubbert and Dieter Zetsche.

The reporting structure used by DaimlerChrysler AG was similar to the one previously utilized by Chrysler. Holden Tr. Vol. C. 579:13–580:7. The fact that members of the Management Board reported to other individuals in their operational role did not diminish their responsibilities as Management Board members. *Id.* Former Chrysler executives who served on the DaimlerChrysler's Board of Management had the opportunity to provide their input into all the operations of DaimlerChrysler, including the former Daimler–Benz divisions such as Mercedes, Smart, DASA and the Commercial Vehicle Division. Holden Tr. Vol. C. 542:9–544:2; Eaton Tr. Vol. D. 877:2–8. Former Chrysler executives were free to participate in Management Board meetings and to bring issues before the Management Board, and their views and opinions were taken seriously by the members of the Board who

previously worked for Daimler–Benz. Holden Tr. Vol. C 574:16–575:25; Stallkamp Tr. Vol. I 1864:12–15.

## C. *The Integration Committee/Shareholder Committee*

The BCA also provided that the Management Board was to establish an Integration Committee that served a consultative function. With regard to the composition of the Integration Committee, the BCA provided that fifty percent of the members of the Integration Committee were to be designated by Chrysler and fifty percent were to be designated by Daimler–Benz. DX 20 at A–17. Upon consummation of the Merger, the Integration Committee was established in accordance with the requirements of the BCA; however, the Integration Committee was later renamed the Shareholder Committee. The Shareholder Committee functioned by taking business items from the agenda of the Supervisory Board for review and comment. Wilson Tr. Vol. H 1700:20–1701:2.

Aljian was a member of the Shareholder Committee from its inception. DX 141, Schrempp Vol. F. 1212:21–23. Between the closing of the Merger and the end of November 2000, Aljian attended at least twelve meetings of the shareholder Committee, including eight meetings in Germany. Aljian actively participated in these meetings. DX 559, 560, 699, 562, 564, 565, 567, 568, 569, 570, 571, 573. Aljian twice complimented management on the excellent job it was doing, praising them for realizing the announced synergies and realizing shareholder value by spinning off the aerospace activities. DX 569, 564. Aljian was present at the meetings discussing the post-merger governance changes and never voiced any objections. DXs 559–562, 564–565, 567–571, 573, 699, 701; PX 968 at ¶ 4; Schrempp Tr. Vol. F. 122:20–1223:11; Wilson Tr. Vol. H. 1731:5–1732:10; Aljian Dep. 415:2–426:13. Aljian

remained a member of the Shareholder Committee until November 24, 2000, when Kerkorian directed him to resign and announce that he did not want to be considered for a position on the DaimlerChrysler Supervisory Board. DX 78.

## D. *Operating Structure of Daimler-Chrysler*

Consistent with the BCA and the Proxy/Prospectus, Chrysler became a wholly owned subsidiary of DaimlerChrysler and Daimler–Benz merged with and into DaimlerChrysler. DX 20 at 11; Holden Tr. Vol. C. 586:9–10. DaimlerChrysler maintained two operational headquarters, one located at the former Chrysler headquarters in Auburn Hills, Michigan and the other at the former Daimler–Benz headquarters in Stuttgart, Germany, DX 20 at 8. The overlapping corporate functions of Daimler–Benz and Chrysler were combined.

As far as business operations were concerned, the Chrysler Brands were kept together in a separate, independent unit of DaimlerChrysler and the Daimler brands were similarly separated. Stallkamp Tr. Vol. I 1887:12–1888:6. Throughout 1999, Aljian received financial reports classifying Chrysler and Daimler (later, Mercedes–Benz) as separate divisions of Daimler-Chrysler. Aljian testified at his deposition that he was not concerned about the references to Chrysler as a division. Aljian Dep. 379:21–392:9; 394:25–395:7; 396:24–25. In fact, Aljian prepared a memorandum for Kerkorian on July 20, 2000, describing Mercedes–Benz and Chrysler as divisions of Daimler–Chrysler. DX 74 at T 13343. Holden also testified that Chrysler was referred to as a division continually throughout shareholder meetings at which Aljian was present. Holden Tr. Vol. C 608:16–609:9. In addition, the September 24, 1999, press release which announced

the stream-lining of the Board of Management referred to the brand divisions within DaimlerChrysler. DX 68 at T 9961. Also, Kerkorian testified at his deposition, that while he did not pay much attention to the structure within DaimlerChrysler, it was not significant to him that Chrysler was a division within DaimlerChrysler. Kerkorian Dep. 328:14–330:5.

## VIII. Post–Merger Changes At Daimler–Benz

### A. *The Management Board Changes*

At the time of the Merger several people including, Eaton, Schrempp and Hilmar Kopper, the Chairman of DaimlerChrysler's Supervisory Board, were concerned that the eighteen member Management Board was too large to function efficiently. Wilson Tr. Vol. H. 1731:13–1732:3, Eaton Tr. Vol. D. 875:6–20, Holden Tr. Vol. C. 594:19–595:5. It was decided that over time, attrition would reduce the size of the Board. Kopper Vol. F. 1153:7–18, Stallkamp Tr. Vol. I 1859:12–20, Valade Tr. 2406:22–2407:1. However, no specific time was set for a reduction in size, until the September 24, 1999 press release. Kopper Tr. Vol. F. 1167:4–14 (deposition excerpt); Schrempp Tr. 1194:1–5, Stallkamp Tr. Vol. I 1859:17–23. In that press release, it was announced that, effective October 1, 1999, the size of the Management Board would be reduced from eighteen to fourteen members. DX 68. Of the fourteen members, five were former Chrysler executives. *Id.*

Both before and after the September 24, 1999 press release, there were several changes on the Management Board of DaimlerChrysler. These changes were approved by the Supervisory Board and unanimously supported by all of the former Chrysler directors who sat on the Supervisory Board. In making appointments to the Management Board, the Supervisory Board tried to find the best person possible to fit the open position and advance the shareholders' interests. Wilson Tr. Vol. H. 1728:16–21, Lanigan Tr. Vol. I 2010:1–11.

In addition, these changes were also discussed by the Shareholder Committee. During his tenure on the Shareholder Committee, Aljian did not voice any objections to the changes. In fact, Aljian supported the changes that were made. DX 573 at T 10214, Schrempp Tr. Vol. F. 1279:7–25. With regard to the 1999 streamlining of the Management Board in particular, Aljian testified at his deposition that he believed it was "smart" to reduce the size of this Board, because the eighteen member board was "cumbersome" and a smaller group would be "beneficial" to the company. Aljian Dep. 415:18–23. Aljian further testified that he was not concerned by the uneven balance that resulted on the Management Board as a result of the streamlining. Aljian Dep. 418:13–22.

During his deposition testimony, Kerkorian testified that if he saw the press release announcing the streamlining, he would not have thought there was a problem, as long as Eaton was still there. At trial, Kerkorian reiterated his view that, as long as Eaton was around, these changes didn't matter to him. Kerkorian Tr. 700:8–703:3.

Of the post-merger changes that occurred, many were at the suggestion of former Chrysler executives like Eaton and Holden. Others were the result of resignations for personal reasons. Holden Tr. Vol. C 593:12–595:5, Eaton Tr. Vol. D. 855:2–859:3, 874:2–5; Schrempp Tr. Vol. F. 1283:3–13, 1287:1–1288:6; Wilson Tr. Vol. I. 1824:2–7, Valade Tr. Vol. L 2412:5–2414:18.

### 1. Dennis Pawley

Since at least September 1998, Tracinda knew that Dennis Pawley was planning to

retire. Pawley announced his retirement one month after the Merger closed. Pawley's retirement was completely voluntary, Eaton Tr. Vol. D 856:11–14, Stallkamp Tr. Vol. I 1881:25–1882:21; Valade Tr. Vol. L 2411–2412:10, and Schrempp tried to persuade Pawley to change his mind and stay on at DaimlerChrysler. Schrempp Tr. Vol. F. 1282:2–6; Stallkamp Tr. Vol. I 1882:14–1883:4. Eaton did not recommend a replacement for Pawley's position, even though he could have done so. Eaton did not believe his decision detracted from the Merger being a merger of equals. Eaton Tr. Vol. D. 870:18–871:4. Holden also believed that former Chrysler executives had "ample voice" on the Management Board such that it was unnecessary to replace Pawley. Holden Tr. Vol. C. 591:20–593:8. Further, both Holden and Eaton testified they did not want to take other executives away from their current positions. Id., Eaton Dep. 216:11–218:10.

### 2. Ted Cunningham

With regard to Ted Cunningham, Eaton testified that he was involved in the decision to ask Cunningham to step down from the DaimlerChrysler Management Board in September 1999. In this regard, Eaton explained that Cunningham was given additional operational responsibilities in his role as Managing Director, and as a result, Eaton believed "very strongly that with those new responsibilities he [Cunningham] should not be on the Supervisory Board." Eaton Tr. Vol. D. 857:10–12. In general, Eaton believed that members of the Management Board were spending too much of their time in meetings and needed to focus on their job responsibilities. Eaton Tr. Vol. D 857:13–859:1. Holden shared Eaton's views regarding Cunningham's departure from the Management Board. Holden Tr. Vol. C 594:17–595:5.

### 3. Thomas Stallkamp

As for the termination of Thomas Stallkamp, Eaton testified that he recommended that Stallkamp be replaced. According to Eaton, Stallkamp and Schrempp had personality conflicts, and Eaton believed Stallkamp was becoming cynical and was no longer the best person to continue on the Management Board. Eaton Tr. Vol. D. 7–24. Valade testified that he also thought that Stallkamp was not an effective leader. Valade Tr. Vol. L. 2412:13–21. Schrempp was not involved in the initiative for Stallkamp to step down. Valade Tr. Vol. L. 2414:15–20. Tracinda was aware that Stallkamp was a problem at DaimlerChrysler, and Eaton discussed Stallkamp's termination, along with the 1999 streamlining that accompanied his termination, with Aljian and other former Chrysler directors on the Shareholder Committee. Wilson Tr. Vol. H. 1729:12–1731:12; Lanigan Tr. Vol. I.2007:10–24; Valade Tr. Vol. L. 2413:25–2414:14. Aljian voiced no dissent to these decisions. Wilson Tr. Vol. H. 1731:8–12, Valade Tr. Vol. L. 2414:11–14.

### 4. Robert Eaton

On January 26, 2000, Eaton announced that his retirement would be effective March 31, 2000. As a result of Eaton's voluntary retirement, Holden became the top former Chrysler executive at DaimlerChrysler. DX 73; Eaton Tr. Vol. F. 1294:14–1295:5; Eaton Dep. 223:16–20. Eaton testified that he discussed his decision to retire with Kerkorian personally. Kerkorian Tr. Vol. B 310:7–9.

### 5. James Holden

In November 2000, Holden was terminated and replaced with Dieter Zetsche. In August or September 2000, Schrempp and Lanigan discussed the possible replacements for Holden if "something good happened for him or something bad hap-

pened." Lanigan Tr. Vol. I.2014:4–12. Schrempp emphasized to Lanigan that he preferred to have an American and a Chrysler employee replace Holden if it became necessary. Lanigan disagreed with Schrempp's view, because he believed nationality should not matter as long as the best person to fill the position was picked. Lanigan Tr. Vol. I 2013:18–2014:12; Schrempp Tr. Vol. F. 1297:7–20.

Holden's departure was ultimately precipitated by the poor financial performance of the Chrysler Group. In late September 2000, DaimlerChrysler announced that the Chrysler Group would suffer a third quarter operating loss of approximately $500 million. There were problems with the minivan project which was being led by Holden and Cunningham. Wilson Tr. Vol. H. 1734:17–22. The new model minivan was going to be produced and several plants needed to be shut down and retooled. To ensure that the market had an adequate supply of minivans before the shutdown, Chrysler increased production of the old model. This production increase led to overcapacity in the marketplace. This overcapacity was coupled with a difficulty selling the old minivan because of the announcement that Chrysler was introducing a new model. As a result, the surplus of old minivans had to be sold at drastically reduced prices, which had a severe impact on the company's financial performance. Wilson Tr. Vol. H. 1733:22–1734:16; Lanigan Tr. Vol. I 2012:16–2013:10.

In early November 2000, Holden sent Schrempp a memo projecting operating losses at the Chrysler Group over the next three years of $6.9 billion. PX 614, DX 808; Schrempp Tr. Vol. F. 1298:9–25. Holden advised Schrempp that he would not be able to present a budget on time, that he had hired outside consultants to develop a "turnaround plan" and that the plan would not be available for 60–90 days. Individuals from both the former

Daimler–Benz and Chrysler expressed concern that Chrysler was "sinking," and they were concerned that Holden had no experience restructuring companies in financial distress. Schrempp Vol. F. 1301:4–12; Lanigan Tr. Vol. I 2017:9–16. Lanigan testified that he was embarrassed by Chrysler's performance and concerned that Holden did not have a plan to respond to the situation. Wilson also agreed with Schrempp that Holden was not properly in control of the management at Chrysler Group. Wilson Tr. Vol. H. 1738:20–1739:4. For these reasons, it was agreed that Holden should be replaced. Wilson Tr. Vol. 1738:3–1739:6; Lanigan Tr. Vol. I 2017:9–16. The decision to replace Holden was supported by three former Chrysler executives still on the Management Board, Gary Valade, Tom Gale and Tom Sidilk. Schrempp Vol. F. 1307:18–1308:4; Schrempp Tr. Vol. H. 1591:9–21, 1594:9–18; Valade Tr. Vol. L 2417:21–2418:16.

When Holden met with Schrempp on November 12, 2000, he realized that he was going to be fired. Holden had spoken with Lanigan, a member of the Supervisory Board, who informed Holden that his meeting with Schrempp would be "bad." Holden Tr. Vol. C. 561:20–562:9; Lanigan Vol. I 2019:25–2020:12. Holden realized from his discussion with Lanigan that Schrempp had "already previewed [his termination] with the Supervisory Board to get their approval." Holden Tr. Vol. C 560:9–17; Schrempp Tr. Vol. F 1301:13–1302:9; Wilson Tr. Vol. H. 1736:3–13.

As Holden acknowledged, "Chrysler didn't do a good job of training guys to be ready for those positions at that level." Holden Tr. Vol. K 2321:25–2322:6. As a result, Lanigan recommended that Holden be replaced by Dieter Zetsche. Lanigan's recommendation was supported by Wilson. DX 573 at T 10214. Indeed, even Holden

testified that Zetsche was "the number one candidate" to replace him. Holden Tr. Vol. C 612:12–613:3. Both Lanigan and Wilson spoke at a meeting of the Shareholder's Committee to voice their support for Zetsche. Aljian was present at this meeting and supported the replacement of Holden by Zetsche. DX 573 at T010214; DX 77 at DCX 107447; Wilson Tr. Vol. H. 1744:2–8; Lanigan Tr. Vol. I.2021:10–22.

6. Other Changes

After Holden's termination, his seat on the Management Board was filled by former Daimler executive Wolfgang Bernhard. PX 635. In 2001, Rudiger Grube was added to the Board of Management, and effective January 1, 2003 Tomas Weber and Bodo Uebber became members of the Management Board. At the time of trial, one executive from Chrysler, Tom Sidilk, continued to sit on the Management Board, and four former Chrysler directors still served on the Supervisory Board.

B. *Senior and Middle Level Manager Changes*

In addition to the changes at the Management Board level, changes also occurred in senior and middle level managers. For example, new American executives were recruited to join DaimlerChrysler from other companies, Holden Tr. Vol. C. 595:5–598:7, and former Chrysler executives resigned to join other companies. *See, e.g.,* Holden Tr. Vol. C. 596:13–20, Stallkamp Tr. Vol. I 1891:8–1892:11.

C. *The Shareholder Committee Changes*

After Aljian resigned in November 2000, the Shareholder Committee evolved into the Chairman's Council, which was comprised of three Americans, three Germans, and one person from each of Japan, Mexico, Switzerland and the Netherlands. Schrempp Vol. F. 1213:2–1214:1, Vol. H.

1598:11–1599:6; Wilson Tr. Vol. H. 1698:24–1699:2. The Chairman's Council was created at the suggestion of several individuals, including former Chrysler directors, Lanigan, Wilson and Allen, to more accurately reflect the diversity and geographic reach of DaimlerChrysler's business. Schrempp Vol. F. 1213:9–1214:6, Wilson Tr. Vol. H. 1699:3–25. Wilson testified that the Chairman's Council was believed to further the company's strategy of moving forward as a global automotive company by including senior business people from other regions of the world. The Chairman's Council was still in existence at the time of trial and was chaired by Schrempp, the Chairman of the Management Board. The Chairman's Council included several American members, Lanigan, Wilson and Lou Gerstner, former Chairman of IBM. Schrempp Tr. Vol. H. 1598:15–20; Wilson Tr. Vol. H. 1700:3–7.

D. *The Creation Of The Automotive Council*

In 1999, the Automotive Council was created. The Automotive Council was run by Tom Gale, a former Chrysler executive, and included the global business heads of the Chrysler Division, the Mercedes–Benz division and the Commercial Vehicles Division. These individuals met monthly with senior technical people. The objective of this Council was to explore opportunities for the three divisions to share equipment and plants. Holden Tr. Vol. C. 599:25–600:22; Schrempp Vol. G. 1331:1–3.

E. *Press Reports Of The Changes*

As the Management Board and other changes at DaimlerChrysler were made, they were widely reported in the press, along with speculation that the Merger was not a merger of equals. *See, e.g.,* DX 521, 529, 532. To address the press speculation, DaimlerChrysler hired the public

relations firm of Bell Pottinger, PX 880 at DCX 0052538, and Eaton and Schrempp publicly maintained that these changes did not undermine the merger of equals. *See, e.g.,* PX 484; 425.

## IX. Schrempp's *Financial Times* And *Barron's Magazine* Interviews

Before Holden's departure in November 2000, Schrempp agreed to an interview with the *London Financial Times ("Financial Times")*. On October 30, 2000, portions of that interview were published in an article in the *Financial Times* (the "October 30th Article"). In pertinent part, the October 30th Article read:

In a wide-ranging interview ahead of this week's two-day meeting [of the DaimlerChrysler Management Board], he [Mr. Schrempp] delivered a passionate deference of both the merger and his ambition to create a global car maker. In doing so, however, he admitted that Chrysler had been relegated to a standalone division. Far from being a "merger of equals," as originally conceived, the deal has emerged as just one deal among several from the "executive war-room" of Daimler's Stuttgart headquarters.

Now that most of Chrysler's old management board has resigned or retired, Mr. Schrempp sees no reason to maintain the fiction. "Me being a chess player, I don't normally talk about the second or third move. The structure we have now with Chrysler (as a standalone division) was always the structure I wanted," he says. "We had to go a roundabout way but it had to be done for psychological reasons". If I had gone and said Chrysler would be a division, everybody on their side would have said: " 'There is no way we'll do a deal.' "

But it's precisely what I wanted to do. From the start structure, we have moved to what we have today.

What DaimlerChrysler has today is a U.S. division where vehicle design, procurement, production and marketing are being overhauled. Mr. Schrempp maintains this was always the plan following the initial post-merger integration, which generated about $1.4 bn (Pounds 970M) in savings.

PX 601. Schrempp was also interviewed for an article in *Barron's Magazine ("Barron's")* which was published on November 4, 2000. The *Barron's* article quotes Schrempp as stating: "We said in spirit it was a merger of equals, but in our minds we knew how we wanted to structure the company, and today I have it. I have Daimler, and I have divisions." PX 615.

At trial, Schrempp did not deny any of the statements he made in the interviews, but contended that the interviewers misinterpreted his remarks. Schrempp Tr. Vol. G. 1325:22–1351:1. Although Schrempp's statements upset Eaton and Holden, and Schrempp maintained at trial that he was also upset by the *Financial Times* article, he never issued a correction or clarifying statement and did not demand a retraction. Schrempp also testified that he believed that a clarification or correction would draw more attention to the article and make more public controversy. Schrempp Tr. Vol. F. 1183:18–1184:9; 1355:24–1356:9. However, Schrempp did address the Chrysler Group's employees in a town hall meeting and apologized for any misunderstanding his remarks created. Schrempp also told Aljian that the *Financial Times* article misrepresented what he was trying to say, and Schrempp reiterated his past requests to set up a meeting with Kerkorian. Schrempp Tr. Vol. G. 1361:22–1362:10; Vol. H. 1596:11–1597:21; Valade Tr. Vol. L. 2430:4–10.

Kerkorian, Eaton and others testified that Schrempp's remarks to the press were upsetting. Eaton Tr. Vol. D 734:5–7,

737:19–738:4; Kerkorian Tr. Vol. B 312:16–313:4. However, ten former Chrysler directors reaffirmed that they would still vote in favor of the Merger, knowing what they know today, including what the *Financial Times* reported. PX 966 at ¶ 12; PX 967 at ¶ 8; PX 968 at ¶ 20. Indeed, Eaton testified that without the Merger, there is a "high probability that Chrysler would be in bankruptcy today . . . ." Eaton Tr. Vol. D. 846:19–21.

## CONCLUSIONS OF LAW

### I. Applicable Legal Standards

#### A. *Claims Under Section 10(b) And Rule 10b–5 of the Exchange Act*

Section 10(b) of the Exchange Act prohibits the use "in connection with the purchase or sale of any security [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 was promulgated in connection with Section 10(b) and "provides the framework for a private cause of action for violations involving false statements or omissions of material fact." *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997).

Section 10(b) claims are similar to common law fraud claims. To establish a violation of Section 10(b), the plaintiff must prove by a preponderance of the evidence that the defendant made (1) a misstatement or omission; (2) of a material fact, (3) with scienter; (4) in connection with the purchase or sale of a security; (5) upon which the plaintiff reasonably relied; and (6) that reliance was the proximate cause of plaintiff's injury. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390–391, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (setting forth standard of proof in securities claim).

#### B. *Claims Under Section 14(a) and Rule 14a–9 of the Exchange Act*

Rule 14a–9 prohibits the solicitation of a shareholder's vote by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a–9. To establish a violation of Section 14(a) and Rule 14a–9, the plaintiff must prove by a preponderance of the evidence that (1) that the defendant made a material misrepresentation or omission in a proxy statement; (2) which caused the plaintiff injury; and (3) the proxy solicitation was an essential link in effecting the proposed corporate action. *See General Electric Co. v. Cathcart,* 980 F.2d 927, 932 (3d Cir.1992).

#### C. *Controlling Persons Claims Under Section 20 of the Exchange Act*

To establish control person liability under Section 20 of the Exchange Act, the plaintiff must prove by a preponderance of the evidence (1) a primary violation of the federal securities laws by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation. *See, e.g., Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998).

#### D. *Common Law Fraud*

To establish common law fraud, the plaintiff must prove that (1) the defendant made a false and material representation; (2) the defendant knew the representation was false or made the representation with reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance upon the representa-

tion; and (5) the plaintiff suffered damage as a result of such reliance. *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del.1983) (citing *Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504, 510–11 (Del.Super.1931)). The plaintiff must prove the elements of common law fraud by a preponderance of the evidence. *See Lord v. Peninsula United Methodist Homes, Inc.*, 2001 WL 392237, *5 (Del.Super.Apr.11, 2001) (citing *Nye*, 162 A. at 509).

## II. Whether The Court Has Personal Jurisdiction Over Defendant Manfred Gentz

█ Because Tracinda voluntarily dismissed its claims under Section 11 and 12 of the Securities Act of 1933, Defendant Gentz now raises the defense of lack of personal jurisdiction. Tracinda has not challenged the timeliness of Defendant's assertion. The Court concludes that Defendant Gentz's challenge to the Court's personal jurisdiction is timely. It is not disputed that Defendant Gentz signed the Registration Statement on behalf of Daimler–Benz, and therefore, the Court concludes that Defendant Gentz could not, in good faith, raise the defense of lack of personal jurisdiction until Tracinda dismissed its claims under the Securities Act. *See, e.g., McIntyre's Mini Computer Sales Group, Inc. v. Creative Synergy Corp.*, 644 F.Supp. 580, 585–586 (E.D.Mich.1986) (holding that defendant was not precluded from challenging personal jurisdiction when claims providing an unambiguous basis for personal jurisdiction were later dismissed); *see also Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1st Cir.1983) (recognizing that defendants did not waive the defense of personal jurisdiction "if it was not available at the time they made their first defensive move").

█ For claims brought under the Exchange Act, personal jurisdiction is permitted to the full extent permitted by the Due Process Clause. *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir.1990); *FS Photo, Inc. v. PictureVision, Inc.*, 48 F.Supp.2d 442, 445 (D.Del.1999); *SEC v. Infinity Group Co.*, 27 F.Supp.2d 559, 563 (E.D.Pa.1998). Where, as here, jurisdiction is based on a statute that provides for nationwide service of process, two components must be established to satisfy the jurisdictional requirements of the Due Process Clause: (1) the defendant must have "minimum contacts" with the United States as a whole, and (2) the exercise of jurisdiction over the defendant must be "reasonable." *SEC v. Euro Security Fund, Coim SA*, 1999 WL 76801 (S.D.N.Y. Feb.17, 1999); *Infinity Group Co.*, 27 F.Supp.2d at 563.

Two types of jurisdiction are implicated in the minimum contacts analysis, specific jurisdiction and general jurisdiction. General jurisdiction exists if the defendant's general business contacts with the United States have been "continuous and systematic," even though they are unrelated to the lawsuit. *SEC v. Gonzalez de Castilla*, 2001 WL 940560, *3 n. 3 (S.D.N.Y.Aug.20, 2001) (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Specific jurisdiction exists when the defendant has purposefully directed his activities toward the forum, and the litigation arises out of or is related to the defendant's contacts with the forum. *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567–568 (2d Cir.1996) (quoting *Helicopteros*, 466 U.S. at 414–416 & nn. 8–9, 104 S.Ct. 1868).

If the defendant had sufficient minimum contacts with the forum, the Court must then determine whether it is reasonable for the Court to exercise jurisdiction over the defendant. In making this determination, courts weigh several factors, including:

(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Metropolitan Life Ins.*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). After a trial, the plaintiff bears the burden of proving, by a preponderance of the evidence, that the exercise of personal jurisdiction is appropriate. *Id.* at 583.

■ Tracinda contends that specific jurisdiction exists over Defendant Gentz.[3] As a basis for the exercise of jurisdiction, Tracinda contends that Defendant Gentz (1) signed the registration statement with regard to the shares of DaimlerChrysler common stock issued to Chrysler's stockholders; (2) served as Daimler–Benz's chief financial officer and a member of the Daimler Management Board; and (3) serves currently as a member of DaimlerChrysler's Management Board.

In response, Defendant Gentz contends that his position on these boards is insufficient to demonstrate that he purposefully directed his activity toward the United States, and that any actions he took in the United States were in his corporate capacity. Defendant Gentz also contends that he was not involved with any of the Merger negotiations, did not meet any Tracinda representatives, and did not authorize any changes to the Management Board since he was not a member of the Supervisory Board. Defendant Gentz contends that Tracinda's decision not to require him to appear at trial, even though it had obtained an order from the Court compelling him to appear, further highlights his position that any involvement he had with the Merger was minimal. As for his involvement in signing the registration statement, Defendant Gentz contends that his signature on that document is insufficient to establish personal jurisdiction, because Tracinda dismissed its Securities Act claims based on the filing of the Registration Statement.

Reviewing the conduct of Defendant Gentz in light of the applicable law, the Court concludes that Tracinda has not established by a preponderance of the evidence that the Court has personal jurisdiction over Defendant Gentz. Defendant Gentz signed the Registration Statement on behalf of Daimler–Benz, but Tracinda chose to voluntarily dismiss its claims related to the Registration Statement. Those cases to which Tracinda points to demonstrate that it is appropriate to exercise jurisdiction over a signatory to SEC documents are cases which involve claims directly predicated upon those documents.[4]

---

**3.** Tracinda does not specify in its briefing whether personal jurisdiction over Gentz should be based on specific jurisdiction or general jurisdiction. However, the Court understands Tracinda's argument to rest on specific jurisdiction because the contacts it advances to support the exercise of personal jurisdiction over Gentz are contacts specifically related to this litigation and not Gentz's general business contacts with the United States. D.I. 1051 at 56–58. In any event, the Court concludes that the contacts advanced by Tracinda are insufficient to support the exercise of general jurisdiction, because they were neither continuous nor systematic. *See e.g. William Rosenstein & Sons Co. v. BBI Produce, Inc.*, 123 F.Supp.2d 268, 274 (M.D.Pa.2000) (recognizing that plaintiff must show "significantly more than minimum contacts to establish general jurisdiction").

**4.** The cases advanced by Tracinda have a different procedural posture than this case. Both *Itoba* and *CINAR* involve motions to dismiss, and the respective courts found that sufficient evidence was presented to make a

*See, e.g., CINAR,* 186 F.Supp.2d at 304 (concluding personal jurisdiction existed over signatory to registration statement where claim was based on filing of false registration statement under Securities Act); *Itoba,* 930 F.Supp. at 41. In this case, however, Tracinda's claims are not directly predicated upon the Registration Statement. Rather, Tracinda's claims are predicated upon the Proxy/Prospectus attached to the Registration Statement. As discussed in greater detail in the context of whether Defendants may be liable under Section 14(a), Tracinda's claims based on the Proxy/Prospectus are only actionable against Defendants Daimler–Benz, DaimlerChrysler and Schrempp, because the Court finds that Daimler–Benz, Daimler-Chrysler and Schrempp participated in the filing and preparation of those documents and allowed their names to be used in connection with the solicitation of Chrysler proxies. Although Gentz testified that he may have read the Proxy/Prospectus, Tracinda has not established that Defendant Gentz was involved in the preparation of that document, that he approved that document or that his name was used in connection with the proxy solicitation. As for Defendant Gentz's role in the Merger, the Court cannot conclude that Tracinda has established sufficient minimum contacts with the United States to support personal jurisdiction. During his deposition, Gentz testified that he was involved in some of

the valuation analyses related to the Merger premium, and Schrempp testified at trial that Gentz participated in a presentation before Standard and Poor's. Schrempp Tr. Vol. F. at 1273:12–1274:18. However, Tracinda has not shown that Gentz was involved in any final decision making or that the Standard and Poor's presentation in which Gentz participated was related to its claims.[5] In addition, the conduct alleged to have been taken by Defendant Gentz was taken entirely in his corporate capacity. *See In re Daimler-Chrysler II,* 247 F.Supp.2d at 583–595 (dismissing claims against Defendant Kopper for lack of personal jurisdiction even though Defendant Kopper attended meetings related to the Merger in the United States and Germany, but conduct was taken in his corporate capacity, involved no final decisions and Tracinda failed to demonstrate a nexus between its claims and the conduct). As the Supreme Court has cautioned, "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). On this record, the Court is not persuaded that the contacts alleged by Plaintiffs are sufficient to establish personal jurisdiction over Defendant Gentz. Accordingly, the Court concludes that Tracinda has not proven by a preponderance of the evidence

prima facie showing of personal jurisdiction. At this juncture, however, Tracinda must prove personal jurisdiction by a preponderance of the evidence, and with the dismissal of its claims under the Securities Act, the Court is not persuaded that Tracinda has met that burden.

5. Tracinda does not contend that Gentz made any misrepresentations during the Standard & Poor's presentation, and does not link that presentation to its claims. Tracinda does contend that Schrempp and Eaton wrote a letter to Harold McGraw III of the McGraw

Hill Companies, Inc. in New York in connection with the pursuit of membership of DaimlerChrysler AG in the S & P 500 in order to correct a press release calling the Merger an acquisition. PX 345 at DCX 0011169. However, Tracinda does not allege that Gentz participated in that correction letter. Tracinda also contends that press materials were prepared for Daimler–Benz and Chrysler executives to respond to questions about the Merger, but again, Tracinda presents no evidence that Gentz used that material in any press statements or conferences.

that the Court has personal jurisdiction over Defendant Gentz.

### III. Whether Tracinda Can Assert A Section 14(a) Claim Against Defendants

Defendants also contend, as a threshold matter, that Tracinda cannot assert a Section 14(a) claim against them as a matter of law, because Defendants did not issue the Proxy Statement.[6] Citing to the decision of the Southern District of New York in *In re Vivendi Universal, S.A.*, 2003 WL 22489764, *7 (S.D.N.Y. Nov.3, 2003), Defendants contend that Tracinda cannot rely solely on the fact that Defendants filed a Registration statement with the SEC that included Chrysler's Proxy Statement. Defendants also contend that they are exempt as a matter of law from liability under Section 14(a), because they are "foreign private issuers."

Tracinda contends that Defendants are liable under Section 14(a), not only because Defendants signed the registration statement which included the Proxy/Prospectus, but because (1) the Proxy Statement was issued jointly by Chrysler and Daimler–Benz, (2) Defendants permitted the use of their names to solicit the proxies, and (3) Defendants made other communications directed at the Chrysler shareholders which were reasonably calculated to secure procurement of their proxies. Tracinda also contends that the exemption for "foreign private issuers" does not apply to Defendants, because the solicitation was not for their securities but for the securities of a domestic corporation. Tracinda further contends that even if the alleged misstatements in the Proxy/Prospectus are attributable to Chrysler, rather than Daimler–Benz, DaimlerChrysler is liable under Section 14(a), because liability is im-

puted to a successor corporation where there is continuity in shareholder interest.

### A. Whether Defendants Jointly Issued The Proxy/Prospectus And/Or Permitted Their Names To Be Used In Connection With The Chrysler Proxy Solicitation

 In full, Section 14(a) provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit *or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)* registered pursuant to section 781 of this title.

15 U.S.C. § 78n (emphasis added). Courts interpreting this section have recognized that a defendant who permits the use of his name in a manner substantially connected to the proxy solicitation may be held liable under Section 14(a) for misstatements and omissions contained in the proxy materials. *Freedman v. Value Health, Inc.*, 135 F.Supp.2d 317, 339 (D.Conn.2001) (citations omitted) (holding that Section 14(a) encompassed defendants who issued a joint prospectus and proxy statement to the shareholders of the other company involved in the merger); *see also SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 66–70 (D.C.Cir.1980) ("That the proxies nominally were sought by the [target's] management is not dispositive; in reality it was [the acquiror] who was seeking the shareholders' votes to approve his taking control. His connection with the transac-

---

**6.** Because the Court has concluded that personal jurisdiction does not exist over Defen-

dant Gentz, Defendant Gentz is excluded from the reference to "Defendants" in this context.

tion was more than substantial. It was pivotal.")

Reviewing the documents filed in this case in light of the applicable law, the Court concludes that Defendants permitted the use of their names in a manner substantially connected to the Chrysler proxy solicitation such that Defendants are properly subject to liability under Section 14(a). In reaching this conclusion, the Court finds that Defendants had an interest in the Chrysler proxy solicitation by virtue of their desire to obtain the approval of Chrysler shareholders for the Merger, and that Defendants jointly participated in and allowed the use of their names to achieve the desired proxy solicitation.[7] The Court's finding in this regard is supported by language contained in both the BCA and the Proxy/Prospectus. The BCA provides that "Chrysler, Daimler–Benz and DaimlerChrysler AG shall prepare and file with the SEC the preliminary Proxy Statement/Prospectus." DX 20 at A–30. In addition, the Proxy Statement confirms Defendants' participation in the joint preparation of the Proxy/Prospectus stating that "[a]ll information contained in or incorporated by reference in this Proxy Statement/Prospectus relating to Daimler–Benz and DaimlerChrysler AG was provided by Daimler–Benz" and that Daimler-Chrysler AG has conducted no business as of the date of the Proxy/Prospectus except that which is "incident to its formation, its execution of, and performance of its obligations under, the Combination Agreement and related agreements, and *its participation in the preparation of this Proxy Statement/Prospectus." Id.* at T 000012, T 000016 (emphasis added). That Defendants intended this to be a joint submission is also demonstrated by their use of the Proxy/Prospectus for Daimler–Benz shareholders in the United States. To this effect, the Proxy/Prospectus states:

> This Proxy/Statement Prospectus is also being furnished to "U.S. persons" (as defined in Rule 902(a) of Regulation S promulgated under the Securities Act of 1933, as amended) who own Daimler–Benz ADSs and Daimler–Benz Ordinary Shares in connection with the invitation by the Daimler–Benz Board of Management (Vorstand) for the Daimler Benz Special Meeting and constitutes the prospectus of DaimlerChrysler AG for use in connection with the offer and issuance of DaimlerChrysler Ordinary Shares pursuant to the Chrysler Merger and the Daimler–Benz Merger.

DX 20 at 2 (T 000005), 8 (000017). The Proxy/Prospectus also points out that "Chrysler will bear the cost of the solicitation of proxies from its shareholders, except that Chrysler and Daimler–Benz *will share equally* the cost of printing and mailing this Proxy Statement/Prospectus." DX 20 at 44 (T 000053).

Defendants point the Court to that portion of the BCA which provides that neither party is responsible for the statements of the other in the Proxy/Prospectus. However, the Court is not persuaded that this allocation of responsibility

---

7. Defendants contend that Schrempp cannot be liable under Section 14(a), because he did not sign the Proxy/Prospectus. However, a proxy is not required to be signed, and therefore, the inquiry does not end there for Schrempp as an individual defendant. Tracinda has demonstrated that Schrempp allowed his name to be used in connection with the proxy solicitation. Schrempp's name figures prominently into the Proxy/Prospectus by virtue of his role as Daimler–Benz's primary negotiator of the Merger. Further Tracinda has demonstrated that Schrempp was involved in numerous representations concerning the merger of equals, as well as in press releases, all of which constitute communications made in connection with the proxy solicitation. Accordingly, the Court concludes that Defendant Schrempp may be subject to liability under Section 14(a).

negates Defendants' interest in the proxy solicitation, their joint preparation and use of it for their shareholders, or the fact that they permitted their names to be used in substantial connection with the proxy solicitation effort. Defendants also direct the Court to the *Vivendi* decision for the proposition that Chrysler's alleged misstatements should not be imputed to Defendants by virtue of Defendants' filing of the registration statement. However, the *Vivendi* court did not address the situation present here which involves joint preparation of the proxy materials, and did not comment on the degree to which, if any, *Vivendi* permitted its name to be used in connection with the proxy solicitation. Because Defendants participated in the joint filing of the Proxy/Prospectus and allowed the use of their names in substantial connection with the proxy solicitation, the Court concludes that they are subject to liability under Section 14(a) unless an exemption applies.

B. *Whether Defendants Are Exempt From The Rule 14(a) Requirements Under The "Foreign Private Issuer" Exemption*

■ To determine if Defendants are entitled to the private foreign issuer exemption, the Court turns first to the relevant statutory language. As quoted above, Section 14(a) refers to the solicitation *"in respect of any security (other than an exempted security) registered pursuant to section 781 of this title."* The exemption at issue is contained in 17 C.F.R. 240.3a12–3(b), which provides that *"[s]ecurities registered by a foreign private issuer ...* shall be exempt ..." (emphasis added). The term "foreign private issuer" is further defined by reference to 17 C.F.R. 240.3b–4. Under this section, a "foreign issuer" includes a corporation incorporated or organized under the laws of any foreign country, and defines a "foreign private issuer" as any foreign issuer other than a

foreign government, except an issuer that meets the following criteria:

(1) More than 50 percent of the issuer's outstanding voting securities are directly or indirectly held of record by residents of the United States; and

(2) Any of the following:

(i) The majority of the executive officers or directors are United States citizens or residents;

(ii) more than 50 percent of the assets of the issuer are located in the United States; or

(iii) the business of the issuer is administered principally in the United States.

17 C.F.R. § 240.3b–4(c).

Tracinda does not contest that Defendants fit into the definition of a foreign private issuer; however, Tracinda contends that when read in conjunction with Section 14(a), the exemption does not apply to the solicitation of shareholders of a domestic company. The Court agrees with Tracinda. By its express language, the exemption under Rule 3a12–3(b) pertains to securities registered *by* a foreign private issuer. In this case, the solicitation was aimed at inducing Chrysler shareholders to vote their shares of Chrysler, a non-exempt registered security, in favor of the Merger. The cases to which Defendants refer do not address the circumstances present here. For example, in *Batchelder v. Kawamoto*, 147 F.3d 915, 922 (9th Cir.1998), the proxy statement was aimed at soliciting the holders of ADRs in Honda, a foreign private issuer. In *Vivendi*, the Court did not analyze this question in detail and held that *Vivendi* was organized under French law and therefore a "foreign private issuer." Further, as discussed above, *Vivendi* did not deal with the situation in which a proxy was jointly prepared. Accordingly, the Court is persuaded that Defendants may be held liable

under Section 14(a), if Tracinda can prove the elements required to establish such a claim.

## IV. Whether Tracinda Has Established By A Preponderance Of The Evidence Its Claims For Common Law Fraud And Violations Of Sections 10b And 14(a) Of The Exchange Act And Rules 10b–5 And 14a–9 Promulgated Thereunder

### A. *Whether Tracinda Has Proven Actionable Oral Misrepresentations*

In support of its claims for common law fraud and violations of the securities laws, Tracinda contends that Defendants made several oral, material misrepresentations through Robert Eaton for which Defendants should be liable. Specifically, Tracinda contends that Eaton told Kerkorian that the proposed transaction would be a "merger of equals," that the Board of Management of the new company would be evenly split, that Eaton and Schrempp would be co-chairmen of the combined company, that the Chrysler team was going to have a significant role in the new company and that the two companies would be equal partners.

### 1. Whether Defendants Should Be Held Liable For Oral Representations Made By Eaton

Tracinda does not advance any oral misrepresentations that were made directly by Defendants to Kerkorian or any other Tracinda representative. Rather, Tracinda's argument rests on Schrempp's alleged use of Eaton as a conduit to funnel allegedly false information to Kerkorian in order to gain his support for the Merger. Thus, as a threshold matter, the Court must first determine whether Defendants should be held liable for the statements made by Eaton to Kerkorian.

A defendant cannot be held liable for the independent representations of a third party, even where those representations are attributed to the defendant, unless the defendant "exercised the kind of control [over the third party's statements] that would render it liable for [those] statements." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993). Without such control, "any statement[s] made by [the defendant] could be taken out of context, incorrectly quoted, or stripped of important qualifiers." *Id.* at 288.

Reviewing the trial testimony elicited from Eaton, Kerkorian and Schrempp, the Court concludes that Tracinda has not proven its contention that Defendants used Eaton to communicate misrepresentations to Tracinda such that Defendants should be liable for any statements made by Eaton to Kerkorian. During the period of time when Tracinda alleges these misrepresentations were made, Daimler–Benz and Chrysler were separate, independent public companies engaged in arms-length negotiations. Defendants exercised no control over Eaton or the statements he made to Kerkorian. Eaton testified that he kept Kerkorian advised in only a general way regarding the progress of his discussions with Schrempp and did not report any details of his discussions with Kerkorian to Schrempp. Eaton Vol. D Tr. 861:5–11; Eaton Dep. 91:5–16; Schrempp Dep. 237:9–240:24. Eaton also denied saying anything to Kerkorian at Schrempp's direction:

Q: Your discussions with Mr. Kerkorian. You weren't reporting the details to Mr. Schrempp, were you?

A: No sir.

Q: And he wasn't telling you what to say to Mr. Kerkorian, was he?

A: Heavens no.

Q: Heavens no.

A: Likewise, I wasn't telling him what to say to Deutschbank or Quadies (phonetic), either.

Eaton Vol. D. Tr. 861:8–10. Eaton's testimony in this regard is also consistent with the testimony of Schrempp:

Q: Did Mr. Eaton ever ask you to do or say anything or accept anything on account of Mr. Kerkorian?

A: No, he never did.

Q: Did you ever ask ... Mr. Eaton to do anything or say anything or accept anything on account of Mr. Kerkorian?

A: No I didn't.

Schrempp Tr. Vol. F. 1183:11–17.

Tracinda directs the Court to the statements the Court made in its summary judgment opinion that

[t]he record evidence suggests that Defendants made a concerted effort to gain Tracinda's support for the [transaction]. Defendants wanted Tracinda's full and unconditional support and knew that *Eaton was communicating Defendants' intentions to Tracinda.* Defendants also wanted Tracinda to enter into the Stockholder Agreement to ensure Tracinda's support for the [Transaction].

*In re DaimlerChrysler,* 294 F.Supp.2d at 625 (emphasis added). The Court's reference to this exchange of information from Defendants to Eaton to Tracinda does not mean the Court concluded that Eaton was providing information under the control and direction of Defendants. As the above testimony of both Eaton and Schrempp demonstrate the conversations were known to the parties, but the content of the conversations was not dictated by either of them. Further, the Court did not address on summary judgment the question of whether Eaton's representations were properly attributed to Defendants. The Court's language only addressed the question of whether Defendants could establish the lack of reasonable reliance by Tracinda as a matter of law in the context of a motion for summary judgment. Now a full trial has been held on the merits of

Tracinda's claims, and the Court concludes that Tracinda has not proven by a preponderance of the evidence that Defendants are liable for the oral statements made by Eaton to Kerkorian. That Schrempp knew that Eaton was talking with Kerkorian at some point and that Schrempp wanted the support of Chrysler's shareholders for the Merger does not establish that Schrempp knew or controlled the substance of what Eaton was saying to Kerkorian. Schrempp Tr. Vol. G. 1485:16–23. Schrempp testified that both sides wanted the support of the others' major shareholders and that he was unaware of the extent to which Tracinda was apprised of the Merger negotiations. Schrempp Tr. Vol. G. 1487:24–1488:3, 1490:17–18, 1494:7–16. In this regard, Schrempp further testified that he never sought to communicate either directly or indirectly with Kerkorian to induce him to vote in favor of the transaction. Rather, as Schrempp put it, "I agreed with Bob Eaton that, so to speak, he would look after his constituency, including the most important shareholder of Chrysler, and obviously my duty was to do the same on the Daimler side." Schrempp Tr. Vol. F. at 1183:2–10. Schrempp's testimony is consistent in all regards with Eaton's testimony as it pertains to this issue. Eaton Tr. Vol. D. 861:5–13. Accordingly, the Court concludes that Tracinda has not established that Defendants are liable to Tracinda for the oral statements made by Eaton to Kerkorian.

2. Whether Tracinda Has Proven That Eaton's Oral Statements Were Material Misrepresentations

■ In the alternative, even if the Court concludes that Defendants could be held liable for the statements made by Eaton, the Court concludes that Tracinda has not proven that actionable, oral misrepresentations were made to Kerkorian. To support a fraud action, "a representation must be definite; mere vague, general or indefi-

nite statements are insufficient." *Pig Improvement Co. v. Middle States Holding Co.*, 943 F.Supp. 392, 406 (D.Del.1996); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427–1428 (3d Cir. 1997). Reviewing the testimony of Kerkorian and Eaton, the Court concludes that the statements made by Eaton to Kerkorian were vague, indefinite and that type of general optimism which is insufficient to support a fraud or federal securities violation claim.[8] *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir.1999) (holding that "vague and general statements of optimism ... even if arguably misleading, do not give rise to a federal securities claim because they are not material"); *see also In re MCI Worldcom, Inc. Sec. Litig.*, 191 F.Supp.2d 778, 784 (S.D. Miss.2002) (holding that statements concerning expected merger synergies were too vague to support a federal securities claim).

In support of its claims of oral misrepresentations, Tracinda advances the testimony of Kerkorian. However, the Court is not fully persuaded by Kerkorian's testimony as it pertains to the specifics of his conversations with Eaton. On detailed points, the Court finds Kerkorian's testimony to be inconsistent with his prior deposition testimony. As such, the Court credits the testimony of Kerkorian only to the extent that it is consistent with the testimony of Eaton on this issue.

Eaton testified at trial that his conversations with Kerkorian were "reasonably general" and not on a very "deep level." Eaton Tr. Vol. D. 762:11–23. A review of Kerkorian's testimony at his deposition and during cross-examination at trial supports the finding that Eaton's description of his conversations with Kerkorian was accurate. Describing the substance of his conversations with Eaton, Kerkorian testified during his deposition as follows:

Q: Can you tell us what Eaton told you about that transaction during that time period?

A: Eaton was very enthused because it puts pressure worldwide. It puts Mercedes more domestically. He liked Jurgen Schrempp. He said, they will really make a great partner, and it's the only company he knew of like that, that, A, would be a good equal merger partners. They were two and two have a chance to go to the five.

Q: Have you told me everything you recall about those conversations between the first conversation and the time it was publicly announced?

A: Have I told you everything I recall?

Q: That's all you can tell me, Mr. Kerkorian.

A: He was very happy with Jurgen Schrempp. He thought he'd be a

**8.** *See also Grossman v. Novell, Inc.*, 120 F.3d 1112, 1117, 1121–1122 (10th Cir.1997) (holding that numerous statements, including among others, that the merger presented a "compelling set of opportunities" was not actionable because statements were "the sort of soft puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism"); *In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, *7 (N.D.Ill. Nov.14, 2000) (holding that statements that merger was "an exceptional strategic fit"; that the combined companies' products "will be attractive to consumers"; that merger was a "major development" in company's growth strategy; and references to synergies that management expected to result from the merger because they "contain[ ] no useful information upon which a reasonable investor would base a decision to invest"); *In re S1 Corp. Sec. Litig.*, 173 F.Supp.2d 1334, 1335–36 & n. 15 & 17 (N.D.Ga.2001) (holding that several alleged misrepresentations regarding company's mergers and acquisition, including among others that companies were "complementary" and that "combining forces ... remains extremely strategic for us" were not actionable).

good partner. He kept telling me that.

Q: What else did Mr. Eaton tell you?

A: About what?

Q: About the merger.

A: About the merger?

Q: Yeah. We got off on a side tangent. I'm trying to get back.

A: I think I told you what it was. He thought that it would be a good growth company together.

Q: Okay. Have you now told me everything that Mr. Eaton told you about the merger?

A: To the best of my memory, yes.

Q: Do you have any way to refresh your recollection?

A: Anything outside of the things I just told you—that's about it.

Kerkorian Tr. Vol. C 633:4–25, 634:1–11. In this vein, Kerkorian also admitted during his deposition testimony that Eaton "didn't get into [the manner in which the Merger would be implemented] much." Kerkorian Dep. 225:9–11. Kerkorian's trial testimony was similarly vague referring to Eaton's alleged statements that Chrysler and Daimler–Benz would be "good partners" and that a transaction between the two might result in beneficial synergies.[9] Kerkorian Tr. Vol. B. 294:13–16, 295:5–15, 297:18–23, 417:25–418:4; Kerkorian Tr. Vol. C. 633:4–634:7. Further, both Eaton and Kerkorian testified consistently that they did not discuss post-merger corporate governance or the way in which the Boards functioned under German corporate law. Eaton Tr. Vol. D 860:16–25; Kerkorian Tr. Vol. B. 294:21–24.

Although Kerkorian testified at trial that he remembered that Eaton told him there would be "equal members on management, Directors of the two companies together," Kerkorian testified during his counsel's follow up question, "I think it was senior management we're talking about. I don't recall that part too well." Kerkorian Tr. Vol. B. at 294:17–20. On this record, the Court concludes that the Eaton testimony relied upon by Tracinda to establish reliance is seriously lacking. Eaton did not discuss an "even split" or a "merger of equals" or even the word "partner" as Tracinda contends, but reiterated in a general way that the two management teams could be combined to form a new company. Eaton Tr. Vol. D. 762:24–763:7, 22–764:8. That Eaton's conversations with Kerkorian were on a general level is further confirmed by the impression Kerkorian's testimony conveyed concerning his understanding of the proposed transaction. Based on Kerkorian's testimony, the Court finds that his understanding of the transaction was premised on broad-based generalities, rather than detailed specifics. By way of example, Kerkorian insisted on direct examination that he recalled that the Management Board of the merged company was to have a 50/50 split of five Americans and five Germans. In actuality, the Supervisory Board was the body that was to have the five/five split. Although Kerkorian was prompted by his counsel to recall that this discussion referred to the Supervisory Board, Kerkorian maintained that the reference of a five/five or 50/50 split was to the Management Board. Kerkorian Tr. Vol. B at 306:25–307:1–25. In sum, the Court concludes that Tracinda

---

9. The vague nature of these representations also defeats any claims by Tracinda of reasonable reliance. As one court has stated:

Merging companies always predict that they will integrate their sales forces and management teams and that they will achieve 'synergies' from the combination. Reasonable investors know better than to rely on these statements, which are all too familiar to market observers.

*Kane v. Madge Networks N.V.*, 2000 WL 33208116, *3 (N.D.Cal. May 26, 2000), *aff'd*, 2002 WL 506286 (9th Cir. Mar.27, 2002).

has not established any misrepresentation based on the composition of the Management Board.

Further, to the extent that Tracinda contends that Eaton orally represented that he and Schrempp would be co-chairmen of the combined company, the Court concludes that this representation cannot be actionable because it was true. No time frame was given for the duration of the co-chairmanship in any oral representations, and once the companies merged, Eaton and Schrempp were co-chairmen of the Management Board until Eaton decided to retire. That Eaton intended to retire within three years of the merger was known to Kerkorian. As Eaton testified, "Through me and through Mr. Aljian, [Mr. Kerkorian] understood that I was going to stay until the merger was well along and that I would have a contract up to three years." Eaton Tr. Vol. D. 764:14–17. That Tracinda knew that Eaton would be retiring within three years was confirmed by the testimony of Kerkorian. Kerkorian Tr. Vol. B. 295:18–23. While Kerkorian testified that he believed that Chrysler would have someone else in the chairmanship spot, Kerkorian's testimony was undermined by the testimony of both Eaton and York. Eaton publicly stated that there would be only one Chairman after he retired, and Eaton did not tell Kerkorian that Holden would become the chairman. Eaton Tr. Vol. D. 859:7–860:4; PX 538; Stallkamp Tr. Vol. I 1981:19–24. Further, York's testimony demonstrates that Tracinda understood that Schrempp would eventually be the sole chairman of DaimlerChrysler. York Dep. 251:22–24.

As for Kerkorian's representations that Eaton orally represented the transaction

as a "merger of equals," Eaton also denied using that terminology with Kerkorian. Eaton Tr. Vol. D 763:8–14. However, even if Eaton referred to the transaction as a merger of equals, the Court is not persuaded that this oral reference, standing alone, is sufficient to form the basis of an actionable oral misrepresentation. While the Court will analyze the term "merger of equals" in greater detail with regard to the representations made in the BCA and the Proxy/Prospectus, the Court is persuaded that, without reference to these written materials, the term is so vague and general that it is insufficient to constitute an actionable oral misrepresentation. The Court's conclusion is consistent with the testimony of numerous witnesses, including Valade and Eaton, Chrysler's two principal negotiators for the Merger. When discussing the meaning of the term "merger of equals," Eaton continually referred to the written materials accompanying the transaction. Eaton Tr. Vol. D at 825:5–14, 827:21–25, 837:3–5, 846:19–22. Similarly, Valade also defined the term "merger of equals" by reference to the written materials, particularly for Valade, by reference to the BCA. Valade Tr. Vol. L at 2492:4–20, 2493:8–14. The two primary investment bankers involved in the Merger also testified that the term "merger of equals" is not limited to a single definition. Dibelius Dep. 228:6–17; Koch Dep.148:3–4; DX 6. Indeed, Kerkorian himself referred to the Proxy/Prospectus in explaining the term "merger of equals," Kerkorian Tr. Vol. B. 293:17–19, and Kerkorian provided no testimony suggesting that Eaton represented or defined the term "merger of equals" in a manner differently from that which was contained in the written documentation.[10]

---

10. Kerkorian also testified that he expected the details of what would constitute the merger of equals to be set forth in written documentation and presented to the Chrysler Board. Kerkorian Tr. Vol. C. 647:17–648:4;

648:16–649:11; 649:14–22; Kerkorian Dep. 226:2–12. Kerkorian's testimony in this regard also negates any assertion of reasonable

Further, the Court finds that any understanding Kerkorian had of the term "merger of equals" apart from the written materials was not based on representations made by Eaton. Kerkorian Tr. Vol. C 649:1–11. In this regard, the Court also notes that Kerkorian himself did not offer specifics when he referred to the term "merger of equals" explaining that a "merger of equals ... means that the two companies are looking at each other to form a company which would have synergism. And the best way I can state that is where two and two make five. That would be my explanation." Kerkorian Tr. Vol. B 276:5–9, 297:14–20; 293:13–25. In the Court's view, this testimony further supports the finding that, standing alone and without reference to the written documentation pertaining to this transaction, the oral representation of the transaction as a "merger of equals" is the type of "promotional phrase" which is devoid of any substantive information, and thus, too vague to be actionable. *See, e.g., Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir.1995) (holding that term "recission-resistant" was not actionable because it lacked the requisite specificity and contained no information on which a reasonable investor would base an investment decision).

### 3. Whether Tracinda Has Demonstrated Reasonable Reliance On Any Oral Representations

Further, the Court concludes that Tracinda has failed to prove that it relied on any oral representations made by Eaton to Kerkorian, and therefore, Tracinda has failed to prove that it was fraudulently induced to enter into the Stockholder Agreement by such alleged oral misrepresentations. The Court also concludes that Defendants have affirmatively proven the absence of reasonable reliance by Tracinda.

■ To establish its claims of common law fraud and a violation of the securities laws under Sections 10(b) and Rule 10b–5 of the Exchange Act, Tracinda must show that it reasonably relied on the alleged misrepresentations or omissions that form the basis of its claims. *Tracinda*, 197 F.Supp.2d at 64 (citing *In re Reliance Sec. Litig.*, 91 F.Supp.2d 706, 720 (D.Del.2000); *Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990)). In the context of Rule 10b–5 claims, the Third Circuit has identified a list of factors for determining whether a plaintiff's reliance was reasonable including, but not limited to: (1) the existence of a fiduciary relationship; (2) the plaintiff's opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of a longstanding business or personal relationship; and (5) the plaintiff's access to the relevant information. *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir.1976). In addition to these factors, the Third Circuit has also recognized that the presence of an integration/non-reliance clause in a written agreement is a factor which should be considered in determining whether the plaintiff's reliance was reasonable. *In re DaimlerChrysler IV*, 294 F.Supp.2d at 622–623. Thus, the determination of reasonable reliance must "be made on a case-by-case basis based on all of the surrounding circumstances." *AES Corp. v. The Dow Chemical Co.*, 325 F.3d 174, 179 (3d Cir.2003). The Third Circuit has further recognized that the absence of reasonable reliance "is in the nature of an affirmative defense," and therefore, the defendant bears the burden of establishing that the plaintiff's reliance was unreasonable. *Straub*, 540 F.2d at 598.

■ Considering the totality of the circumstances, in light of the applicable law and the evidence adduced at trial, the Court concludes that Tracinda was not fraudulently induced to enter in to the

reliance on any alleged oral representations by Eaton concerning the "merger of equals."

Stockholder Agreement, did not rely on any oral representations allegedly made by Eaton, and that, even if Tracinda relied on such oral representations, its reliance was unreasonable under the circumstances. In reaching the latter conclusion, the Court has weighed the *Straub* and other relevant factors and finds that on balance, the circumstances demonstrate that Tracinda could not have reasonably relied on any oral representations allegedly made by Eaton. Kerkorian was kept apprised of the Merger negotiations not only by Eaton, but by numerous individuals representing Tracinda, including Jerry York, Richard Sobelle, Jim Aljian and Anthony Mandekic. Aljian Dep. 27:19–28:3. Although Kerkorian testified that he did not pay attention to the materials submitted by these individuals, the Court finds that the evidence suggests otherwise, and that in any event, it would have been unreasonable for Tracinda to rely on Eaton when it had its team of highly paid advisors working on its behalf. As the Court previously concluded, Eaton only generally apprised Kerkorian of the negotiations; however, the aforementioned Tracinda representatives were asked by Kerkorian to provide him with more detailed information and to make sure that the written agreements embodied the transaction that Tracinda expected. Mandekic Tr. Vol. A. 162:5–163:3, 165:7–14; Kerkorian Tr. Vol. C. 649:1–11, 652:10–15. Aljian represented Tracinda on the Chrysler Board and was an active participant in the Board's meetings. Aljian updated York whenever he received information from Chrysler and York used the nonpublic information that Aljian received to prepare numerous detailed analyses for Kerkorian. DX 31, 37. As Tracinda stated in its press interview materials, "We have been kept informed of the status [of the negotiations] by virtue of our representation since February, and provided periodic input, including indicating our strong support." DX 42.

In addition to Tracinda's clear channel of access by virtue of its representation on the Chrysler Board, Tracinda was also a sophisticated investor with a business practice of requiring written documentation before entering into a major transaction. Mandekic Tr. Vol. A. 143:1–20. Indeed, the complexity and magnitude of this transaction as a multi-billion dollar cross-border transaction, the largest industrial merger of its kind at the time, and the first between a U.S. and German public company, weighs in favor of finding a lack of reasonable reliance on any oral representations. *Cf. Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 551 (2d Cir.1998) (recognizing that million-dollar acquisition was "clearly ... the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and other standard provisions usually found in sophisticated, formal contracts"); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262–263 (2d Cir.1984) ("[T]he magnitude and complexity of the deal as reflected in the numerous written contract drafts not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents.").

Moreover, the written documents governing this transaction contradict the oral representations allegedly made by Eaton to Tracinda and contain integration clauses precluding the parties from incorporating any oral representations into the parties' agreements.[11] Specifically, the Stockhold-

---

11. The Court also notes that the Proxy/Prospectus contained a non-reliance clause for representations contained outside the Proxy/Prospectus. Specifically, the Proxy/Prospectus stated:

er Agreement by which Tracinda committed to vote its shares in favor of the Merger provides:

> This Agreement, the Standstill Agreement, and the other agreements executed and delivered by any of the parties hereto and the Stockholder in connection herewith constitute the entire subject matter hereof and supersede all other prior agreements and understandings, both written and oral, between the Stockholder and such other parties with respect to the subject matter hereof.

DX 108 at 250, § 4.3. The BCA contains a similar clause, and both the BCA and the Stockholder Agreement were negotiated at arms length and reviewed by in-house and outside counsel for Tracinda. DX 39, Aljian Dep. 245:18–246:18. Such clear language included in business agreements between sophisticated business entities certainly weighs in favor of a conclusion that Tracinda's alleged reliance was unreasonable. *See, e.g., AES Corp. v. Dow Chem. Co.,* 325 F.3d 174, 180–183 (3d Cir.2003); *St. James Recreation, LLC v. Rieger Opportunity Partners, LLC,* 2003 WL 22659875, *3 & n. 14 (Del.Ch. Nov.5, 2003); *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.,* 2002 WL 1558382 at *7 (Del.Ch. July 9, 2002).

In addition, the clear language of the BCA is at odds with the alleged statements that Tracinda attempts to attribute to Eaton. For example, the BCA did not provide for an "even" split on the Management Board. It provided for a Management Board comprised of eight former Chrysler members and ten former Daimler–Benz members. DX 20 at 65–66. Similarly, the BCA provided to Chrysler, before the Merger closed, the right to replace any Chrysler designee to the Management Board that ceased to be employed by Chrysler. However, there was no provision for Chrysler to make such replacements after the Merger closed. Thus, while not alone dispositive, the Court concludes that the presence of the integration clauses in the documents and the contradictions in the written agreements compared to the alleged oral representations weigh against a conclusion of reasonable reliance by Tracinda.[12]

Further, the Court finds that Defendants had no long-standing business or personal relationship with any of Defendants that would tip the scales in favor of finding reasonable reliance. *See, e.g.,*

---

**No person has been authorized to give any information or make any representations not contained or incorporated by reference in this Proxy Statement/Prospectus and, if so given or made, such information must not be relied upon as having been authorized by DaimlerChrysler AG, Daimler–Benz, Chrysler or any other person.**

DX 20 at 5 (bold type in original). Although the Court has concluded that Tracinda was obligated to vote for the Merger prior to the issuance of the Proxy/Prospectus, the presence of this non-reliance clause further weighs against a finding of reasonable reliance on oral representations by Tracinda.

12. *See Poth v. Russey,* 281 F.Supp.2d 814, 822 (E.D.Va.2003) (finding no reasonable reliance on oral representations that contradicted written agreements that plaintiffs received, reviewed and discussed with lawyers where plaintiff was sophisticated investor), *aff'd,* 2004 WL 614623, 99 Fed.Appx. 446 (4th Cir. Mar.20, 2004); *BRLI No. 1 Acquisition Corp. v. Klafter,* 2002 WL 31431469, *4 (D.N.J. Aug.30, 2002) (holding that plaintiff's reliance was not reasonable where plaintiff was sophisticated buyer, no fiduciary relationship existed between the parties and alleged misrepresentations conflicted with financial statements provided by defendant); *see also DeBakey Corporation v. Raytheon Service Co.,* 2000 WL 1273317, *22 (Del.Ch. Aug.25, 2000) (holding that plaintiff could not reasonably rely on oral promise of defendant to provide more than $2 million in funding where written agreement expressly gave defendant discretion to terminate once $2 million limit was reached).

*N.S.N. Int'l Indus., N.V. v. E.I. DuPont De Nemours & Co.*, 1994 WL 148271, *7–8 (Del.Ch. Mar.31, 1994) (finding that no fiduciary duty existed where parties' relationship existed as a result of contract negotiated at arm's length). Although Tracinda points to Kerkorian's relationship with Eaton, the Court has concluded that Defendants exercised no control over what Eaton communicated to Kerkorian, and therefore, Defendants have no liability for Eaton's statements. Indeed, after hearing Kerkorian's trial testimony regarding his relationship with Eaton, the Court is persuaded that it would have been unreasonable for Kerkorian to rely on the oral representations of Eaton. Kerkorian's trial testimony demonstrated that the two had experienced several periods of tense disagreement. For example, Tracinda, through Kerkorian and York, threatened Eaton with litigation [13], publicly questioned his management abilities [14], and thought about the possibility of replacing him if he left because of the difficulties between him and Kerkorian.[15] Additionally, a misunderstanding between Kerkorian and Eaton led Tracinda to attempt a hostile takeover of Chrysler.[16] Given the prior difficulties between Eaton and Kerkorian, the personal financial stakes of the Chrysler executives in the deal, the presence of written documentation contradicting the alleged oral representations and containing integration clauses, the sophistication of Tracinda as an investor, its business practice of documenting transactions in writing, its access to the Board of Chrysler, and the magnitude and uniqueness of the Merger, the Court concludes that it would have been unreasonable for Tracinda to rely on the oral representations of Eaton.

Moreover, the Court finds that Tracinda's decision to enter into the Merger was not guided by corporate governance considerations or the "merger of equals" label, and therefore, as a factual matter, the Court is not persuaded that the record evidence can support a conclusion that Tracinda relied on any alleged oral representations concerning corporate governance. In this regard, Kerkorian's testimony on direct examination that he relied on Eaton's oral representations concerning corporate governance is contradicted by his testimony on cross-examination, as well as by his conduct during the relevant time, and several document exhibits admitted into the record. Taking this evidence as a whole and in context, the Court concludes that it demonstrates that Tracinda did not find corporate governance or the "merger of equals" label to be important at the time of the Merger. Kerkorian supported the Merger and thought there "would be a good value" in the transaction before he had any discussions about corporate governance. Kerkorian Tr. Vol. B. 423:4–12; 417:8–421:17. Kerkorian never expressed to Eaton that he was interested in corporate governance issues, Eaton Tr. Vol. D 860:16–18; PX 966 at ¶ 3, he did not discuss such issues with Eaton, and he admitted during his deposition that he was not concerned with these management issues:

Q: Would you have been concerned about Mr. Schrempp naming a management team for the new company that left control firmly in the hands of the former Daimler executives?

A: No. I still felt it was all one company.

Kerkorian Dep. 349:18–22, 225:9–16. While Kerkorian maintained on direct that

---

**13.** Kerkorian Tr. Vol. B 323:21–324:18.

**14.** DX 234–235.

**15.** Kerkorian Dep. 126:10–127:2, DX 24 at 27.

**16.** DX 96, 123; Kerkorian Tr. Vol. B 330:3–13; 331:5–9; DX 698; Aljian Dep. 22–16–19.

the "merger of equals" was important to him, on cross-examination, Kerkorian echoed his deposition testimony nearly verbatim as to what he found to be the important aspects of the Merger:

Q: Am I correct that the issues that were of significance to you were the price?

A: Yes.

Q: Timing?

A. Timing.

Q: And whether it would be a good growth company?

A: Yes.

Q: And that is all the issues, isn't it?

A: Probably. Could have been some others.

Q: But that's what you recall?

A: I will accept that.

Kerkorian Tr. Vol. C. 629:13–630:2, DX 47; 85; Kerkorian Tr. Vol. C. 668:24–669:7; Kerkorian Dep. 234:18–235:23. Testifying further at his deposition, Kerkorian admitted that if Eaton was still at Chrysler, he would not have felt that the Merger was a takeover, regardless of the number of members from Chrysler on the Management Board:

Q: Well, if you had brought Eaton back and Eaton had come out of retirement, would you have felt it was a takeover by Mr. Schrempp?

A: No.

Kerkorian Dep. 396:11–14. At trial, Kerkorian added that he only shared the view

he expressed at his deposition if the constitution of the Management Board was the same as it was at the time of the Merger, but Kerkorian's assertion is belied by the fact that the Management Board was not the same when he made his remarks, but was a nine to four split. Kerkorian Tr. Vol. C 686:22–687:1. Kerkorian's testimony that he was primarily concerned about the composition of the Management Board [17], is further undermined by his deposition testimony that he was focused on the "top group" of Eaton and Schrempp, and his trial testimony confusing the composition of the Management Board with the Supervisory Board.[18] Kerkorian Tr. Vol. B. 306:20–308:5; Kerkorian Dep. 341:21–24.

Kerkorian's assertion that he was troubled by the unequal management division is also challenged by the lack of attention he paid to articles circulated by York and Alijian concerning the changes in the Management Board. When asked about one of these articles at trial, Kerkorian confirmed his lack of interest at the time, and reiterated the point he made at his deposition that as long as Eaton was there, he was content:

Q: You've told me about your concern and how much importance you placed on this equal division. Why were you not concerned?

A: Because I had a lot of other things on my mind.

---

17. See Kerkorian Tr. Vol. B. 308:8–13; Vol. C. 644:7–9.

18. At trial, Kerkorian testified that he was concerned about the composition of the Management Board because he perceived that board to be the more important board. However, Kerkorian's testimony that he believed the Management Board to be the more important board is undermined by testimony of Aljian that it was an affront to a major shareholder to be passed up for a seat on the

principal board of the company, the Supervisory Board. Aljian Dep. 253:11–13, 254:8–19. Further, at his deposition, Kerkorian himself indicated that he understood that the Supervisory Board was the more powerful board:

Q: Did Mr. Aljian express to you at any time the fact that the Supervisory Board held the power at DaimlerChrysler?

A: I don't recall him saying it, but *I think we were all aware of it.*

Kerkorian Dep. 49:25–50:5.

Q: It wasn't important to you at the time?

A: Listen, it was important that Robert Eaton was there and the synergism. They were picked up and the business was doing well. He was happy with it and made me happy with it.

Q: So if Eaton was happy, you were happy?

A: Yes.

Kerkorian Tr. Vol C. 690:24–691:9, 692:19–693:9. Kerkorian responded in similar fashion when presented with other articles, including articles that discussed Chrysler's operation as a division testifying:

Q: The fact is, as long as Mr. Eaton was around, it didn't matter much, did it?

A: That's mainly it.

Kerkorian Tr. Vol. B. 700:8–703:3.

The finding that Tracinda was not principally concerned about these corporate structure and governance issues is further supported by the testimony of Aljian. Aljian was present when the post-merger governance changes were discussed at the Shareholder Committee meetings and never voiced an objection to the proposed changes, and in fact, supported the changes. DXs 559–562, 567–571, 573, 699, 701; Schrempp Tr. Vol. F. 1222:20–1223:11; Wilson Tr. Vol. H. 1731:5–1732:10; Aljian Dep. 415:2–426:13. Aljian also referred to Chrysler as a division in the memos he shared with Kerkorian and testified that he was unconcerned about references to Chrysler as a division. Aljian Dep. 379:21–392:9, 394:25–395:7, 396:24–25; DX 74 at T 13343; Kerkorian Dep. 328:14–330:5.

Internal documents of Tracinda prepared by York and Aljian also demonstrate that Tracinda was not focused on corporate governance issues, but on the economics of the transaction. DXs 34–38. For example, York prepared an analysis dated February 16, 1998, of the combined value of Chrysler and Daimler–Benz which stated that "*the* key issue" was the "PE multiple of [the] combined entity." DX 34 at Y 58 (emphasis in original). York went on to state that "[t]he valuation potential is so great that nothing should stand in the way of a complete board evaluation of this possible combination." At the time York prepared this memo, he had no information about corporate governance and the term "merger of equals" had not yet been used to describe the transaction. York Dep. 173:10–18, Kerkorian Tr. Vol. B 423:4–12.

In a March 4, 1998 Memorandum, which York described as including all the reasons he could think of that the Merger could produce "huge value," York did not include the term "merger of equals" and made no reference to corporate governance. York stated that the "[s]ituation is compelling to do the merger" and "[n]ow is the time to do it, b[e]fore the Chrysler-specific risks materialize." DX 35 at T 8813. York went on to say that "no conceivable Chrysler standalone plan can achieve the value of the synergies of a merger." DX 35 at T 8813. Additionally, Aljian referred to this memo during his deposition testimony and described it as "show[ing] the basis of the benefit of the merger." Aljian Dep. 201:11–13.

The Court further finds that Tracinda's view of the transaction did not change as discussions concerning the Merger progressed. Significantly absent from a memorandum entitled "Cleveland/Denver Key Issues" which was created a week before the Chrysler Board approved the Merger, is any mention of the term "merger of equals" or of the post-merger governance structure of the combined entity. Yet, York described this Memorandum as embodying his views, as well as the views of Aljian and Sobelle, concerning the key issues of the transaction, and Kerkorian could not identify any issues beyond those

discussed in the Memorandum that were important to him. Kerkorian Dep. 233:21–235:21; Kerkorian Tr. Vol. C. at 629:8–630:3. Accordingly, the Court concludes that Tracinda has failed to demonstrate the reliance element necessary to sustain its claims. The Court further concludes that Defendants have proven that even if Tracinda relied on the statements of Eaton, such reliance would have been unreasonable under the circumstances of the Merger transaction.

B. *Whether Tracinda Has Proven Actionable Written Misrepresentations In The Stockholder Agreement, The BCA, Or The Proxy Prospectus*

Based on the arguments made by Tracinda in its post-trial briefing and at trial, it appears to the Court that the documents supporting its claims of written misrepresentation are the Proxy Statement, Eaton's letter transmitting the Proxy Statement [19] and the BCA. D.I. 1019 at 55–59; D.I. 1051 at 10–11. With this understanding, the Court will proceed to determine whether the statements made in the Proxy, Eaton's letter and the BCA are actionable misrepresentations for purposes of Tracinda's Section 10 and 14 claims.

1. Whether The Statements In The BCA, Eaton's Letter and the Proxy/Prospectus Were False

▆▆ Tracinda contends that Defendants made five material misrepresentations based on the contents of the BCA, Eaton's letter and the Proxy/Prospectus. Specifically, Tracinda contends that (1) the transaction was represented to be a "merger of equals," but Defendants never

intended the transaction to be equal; (2) the transaction was represented to entail joint management and control, but Defendants never intended to share management and control; (3) the Defendants falsely represented in the Proxy/Prospectus that two non-automotive members of the DaimlerChrysler Board were to be non-voting members; (4) the Proxy/Prospectus is false and misleading regarding the parties decision to use the corporate form of a German AG; and (5) the Risk Factors section of the Proxy/Prospectus omits any reference to management changes. D.I. 1018 at 1061–1066; D.I. 1019 at 52–62.

a. The merger of equals and joint management and control representations

The Court begins its analysis of alleged written misrepresentations with the most prominent and controversial alleged misrepresentation, i.e. the characterization of the transaction in the Proxy/Prospectus, Eaton's letter and the BCA as a "merger of equals." The starting point for the Court's analysis is the relevant documents, beginning with the BCA. The BCA contains a lengthy definition section, but the term "merger of equals" is not defined in that section. Instead, the "Whereas" clauses of the Agreement state:

Whereas, Daimler–Benz and Chrysler desire to combine their respective businesses, stockholder groups, managements wand other constituencies in a merger of equals transaction *upon the terms and subject to the conditions of this Restated Agreement;*

Whereas Daimler–Benz, Chrysler and DaimlerChrysler AG desire *to make cer-*

---

**19.** While Eaton's statements are also not attributable to Defendants for the same reasons discussed in the context of the alleged oral misrepresentations, the Court includes them in the discussion because they impact the definition of the term "merger of equals" and are contained in the joint Proxy/Prospectus for which Defendants have liability as discussed infra Section III.B.1.

*tain representations, warranties, cove-nants and agreements in connection with the transactions* contemplated by this Restated Agreement . . . .·

DX 20 at A–1 (emphasis added).

Based on these clauses, the Court finds that the contemplated "merger of equals" is first defined by reference to the representations contained in the BCA. With regard to issues of corporate governance, the BCA provides that "DaimlerChrysler AG shall have a corporate governance reflecting that the transactions contemplated herein are a merger of equals." DX 20 at A–16. The BCA specifies that after the Effective Time, the Supervisory Board shall consist of twenty members, five recommended by Daimler–Benz and five recommended by Chrysler. *Id.* For a period of not less than two years from the Effective Time, the BCA provides that the current Chairman of Daimler–Benz's Supervisory Board shall continue as Chairman of the DaimlerChrysler AG Supervisory Board. *Id.* With respect to the Management Board, the BCA provides:

> The Management Board (Vorstand) of DaimlerChrysler AG shall consist of 18 members. *In general,* 50% of such members shall be those designated by Chrysler and 50% of such members shall be those designated by Daimler–Benz *and there will be two additional members with responsibility for Daimler–Benz's non-automotive businesses.* For three years following the Effective Time, Jurgen E. Schrempp and Robert J. Eaton shall be the Co–CEO's and Co–Chairman of the Management Board of DaimlerChrysler AG and members of the Office of the Chairmen of Daimler–Chrysler AG. *If any person designated as a member of the Office of the Chairman or the Management Board of Da-imler Chrysler AG ceases to be a full-time employee of either Chrysler or Da-*

*imler Benz at or before the Effective Time, Daimler–Benz, in the case of any such employee of Daimler–Benz on the date hereof or any such employee to be designated by Daimler–Benz, or Chrys-ler, in the case of any such employee of Chrysler on the date hereof or any such employee to be designated by Chrysler, shall designate another person to serve in such person's stead.*

*Id.* (emphasis added).

Although the BCA provides for the right of Chrysler and Daimler–Benz to replace a designee to the Management Board if that individual ceased to be a full-time employee of the company prior to the effective date of the Merger, no such provision existed for the departure of executives after the Merger closed. *Id.* at A–16–17. Other than the time frames placed on the Chairmanship of the Supervisory Board and the Co–Chairmanship of the Management Board, no provision of the BCA specifies how long the composition of the respective Boards were to last. The BCA also provides that the post-merger governance structure is based on "recommendations" and is subject to the powers of the shareholders, the Supervisory Board and the Management Board.[20]

The term "merger of equals" also appears in the Proxy Statement and in Robert Eaton's letter to the shareholders accompanying the Proxy Statement. With regard to the term "merger of equals," Eaton's letter states:

> *The Chrysler Merger and the other transactions described in the attached Proxy Statement/Prospectus together will have the effect of combining the businesses, stockholder groups, managements and other constituencies of Chrysler and Daimler–Benz in a "merger of equals" transaction. Daimler-*

---

**20.** Under German law, the Supervisory Board appoints the Management Board.

Chrysler AG will *bring together two companies* with *equal financial strength* under the *joint leadership of both management groups* and with its *common equity about evenly split* between the two shareholder groups.

DX 20 at cover page (T 000001) (emphasis added).

The Proxy Statement refers to the transaction having a post-merger governance structure of a "merger of equals" and reiterates the governance provisions provided for in the BCA stating that "the Management Board (Vorstand) of Daimler-Chrysler AG (the 'DaimlerChrysler Management Board') shall *initially* consist of 18 members...." DX 20 at 16. That this composition of the Management Board was an "initial" composition was further specified in the initial selection process for the Board members which is outlined in the Proxy/Prospectus and states:

Ten of such members will be those *initially* designated by Daimler–Benz, including two members with responsibility for Daimler–Benz' non-automotive business, and eight of such members will be those *initially* designated by Chrysler.

DX 20 at 66 (emphasis added). The Proxy/Prospectus goes on to state:

*The Combination Agreement contains no provision that would bar governance changes after the Transactions have been consummated.*

DX 20 at 17 (emphasis added). Comparing the rights of stockholders in Chrysler and DaimlerChrysler AG in an effort to highlight the differences between ownership of an American corporation and a German AG, the Proxy goes on to explain:

The members of the DaimlerChrysler Management Board may be removed prior to the expiration of their terms by the DaimlerChrysler Supervisory Board only for reasons amounting to good cause, such as gross breach of duty, inability to duly fulfill their responsibili-

ties or revocation of confidence by the stockholders' meeting. In the case of vacancies, *the DaimlerChrysler Supervisory Board may fill the vacancy by appointing a new member of the DaimlerChrysler Management Board.* Members of the DaimlerChrysler Supervisory Board elected by the stockholders at the general meeting may be removed upon the affirmative vote of a majority of at least 75% of all votes cast at a stockholders' meeting. Any member of the DaimlerChrysler Supervisory Board can be removed for good cause, including gross breach of duty, by a court decision upon request of the Daimler-Chrysler supervisory Board. In such case, the DaimlerChrysler Supervisory Board's determination to take such action requires a simple majority vote with the member affected having no voting power. In the case of vacancies, the competent court upon a motion by the management board, by a member of the supervisory board, by a stockholder or by certain employee representatives, may fill the vacancy for the interim period until the next election by the stockholders or the employees, as the case may be.

DX 20 at 133 (emphasis added).

The Proxy Statement also discusses the merger of equals in other sections, but does so by reference to the BCA. For example, in discussing those factors that led the Chrysler Board to approve the transaction, the Proxy states:

The merger of equals corporate governance structure *contemplated by the Combination Agreement,* which, in the view of the Chrysler Board, means that Chrysler's directors and senior management will be in a position to help bring about the realization of the enhanced growth prospects and synergies expected from the combination of the two com-

panies, for the benefit of stockholders of DaimlerChrysler AG (including former stockholders of Chrysler).

*Id.* at 51.

Reviewing the term "merger of equals" as it is used in these documents, the Court concludes that Tracinda has not established a misrepresentation based on the use of the term "merger of equals." Although the BCA and the Proxy/Prospectus set forth proposals concerning the numbers of individuals on the Management Board and the Supervisory Board from each side of the transaction, those documents do not require the proposed compositions to last for any specific period of time, reiterate that the proposed compositions are initial compositions, state that the proposed compositions are recommendations subject to the rights and approval of the shareholders and the Supervisory Board, and make clear that changes to the corporate governance structure are not barred after consummation of the transaction.

Further, the Court is persuaded that it should not read the BCA and the Proxy/Prospectus in the manner suggested by Tracinda which would require the continued appointment in the future of individuals from the Chrysler side and the Daimler–Benz side for several reasons. First, when the transaction closed, the companies merged into a new company, DaimlerChrysler. At that point, there was no longer two independent companies to make recommendations to the Management Board. Second, there is nothing in the BCA, or any other document, dictating the nationalities of the members of the Management Board or their one-time corporate affiliation. Further, the BCA and the Proxy/Prospectus make clear that the recommendations to the Management Board are made subject to the powers of the Supervisory Board, and under German law, it is the Supervisory Board that is responsible for filling vacancies on the Management Board. DX 20 at A–16. Indeed, as Eaton observed, an interpretation which would bind the Management Board to a rigid quota systems could inhibit the Supervisory Board from carrying out its fiduciary responsibilities. Eaton Tr. Vol. D. 827:19–25. Such a result would not only be practically unworkable, it would be legally flawed. *See, e.g., Paramount Communications Inc. v. QVC Network, Inc.,* 637 A.2d 34, 51 (Del.1994) ("To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable.")

As for Eaton's representations in his cover letter to the Proxy/Prospectus, the Court concludes that those representations do not constitute actionable misrepresentations. In reaching this conclusion, the Court finds that Tracinda has not proven by a preponderance of the evidence that Eaton's statements were false or misleading. Eaton's statements regarding the strength of Chrysler and Daimler–Benz and the split of common equity were indicative of that snapshot in time to which they referred, and Tracinda has not demonstrated that they were false. Indeed, it should have been obvious, particularly to a sophisticated investor like Tracinda, that the division of equity would change over time as shareholders in the new company from both constituencies would be free to buy and sell their shares of the new company. As for Eaton's other statements, Eaton did not promise "equal" management or control of DaimlerChrysler AG, but indicated that the newly formed DaimlerChrysler AG would "bring together two companies ... under the *joint leadership of both management groups* ...." DX 20 at cover page (T 000001). In the Court's view, these representations describe the transaction consistently with the terms of the BCA and the Proxy/Prospectus. At

the time of the Merger, the Supervisory Board contained an equal split in members[21], and the Management Board included seven former Chrysler executives and nine former Daimler–Benz executives. The Management Board was co-chaired by Eaton and Schrempp as provided for in the BCA and the Proxy/Prospectus. The Shareholders Committee also included Eaton and Schrempp plus at least six designees from each company. As such, the make-up of the merged company was consistent with the joint leadership envisioned by Eaton.

Tracinda suggests that the merger of equals representations and Eaton's representations in the cover letter were false, because the composition of the Management Board changed over time, and certain vacancies that were left open by former Chrysler executives were either not filled or filled by German former executives of Daimler–Benz. As the Court has already found, however, there was nothing in the written documents that required the composition of the Management Board to remain static or that dictated the nationality or former corporate affiliation of members. To the contrary, the Proxy Statement expressly noted that the composition of the Boards outlined in the Proxy/Prospectus was the initial composition and that governance changes could follow after the consummation of the transaction. The Proxy/Prospectus also explained that the Supervisory Board of the new company had the authority and discretion to appoint and remove members of the Management Board, and nothing in the Proxy/Prospectus or the BCA required vacancies to be filled, let alone filled by American individuals with a former affiliation with Chrysler. DX 20 at 133. Further, the Proxy/Prospectus and the BCA both disclosed that

Eaton would retire after three years, and thus, a change in management was to be expected. Accordingly, the Court cannot conclude that the "merger of equals" representations in the relevant documents were false.

Tracinda also contends that Defendants never intended to honor their "merger of equals" promise or to share management and control of DaimlerChrysler AG. In support of its position, Tracinda directs the Court to Schrempp's now infamous interview with the *Financial Times* and *Barron's*, as well as to the numerous post-merger changes made to the Daimler-Chrysler Management Board.

As a legal matter, however, Tracinda's argument is based on the Supreme Court's decision in *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001). In *Wharf,* the Supreme Court recognized that the making of a promise with no intent to fulfill that promise, coupled with a later refusal actually to fulfill the promise, constitutes a misstatement. Key to *Wharf's* holding is that the promise which was made was not actually fulfilled. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1096, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). As the Third Circuit recognized in a slightly different context, "the unclean heart of a director is not actionable, whether or not it is 'disclosed,' unless the impurities are translated into actionable deeds or omissions both objective and external." *Lewis v. Chrysler Corp.*, 949 F.2d 644, 651 (3d Cir.1991). In analyzing the representations made in the BCA and other documents concerning the "merger of equals," the Court has concluded that the representations which were made were not false.[22] Accordingly, Tra-

---

21. The Supervisory Board also maintains an equal split in its membership to date.

22. Further, as the Court stated in its Findings of Fact, the changes to the Management Board were supported by all the Chrysler

cinda has failed to prove that the promises made were not actually fulfilled as required by *Wharf,* and therefore, Tracinda cannot establish a misrepresentation based on its allegations that Defendants never intended the Merger to be a "merger of equals" and never intended to share joint management.

### b. Selection of the German AG form

█ In addition to the written statements concerning the "merger of equals" and Eaton's statements in his cover letter to the Proxy regarding joint leadership, Tracinda also contends that the Proxy Statement was false and misleading regarding the selection of a German AG as the new corporate form for the merged entity. In this regard, Tracinda states:

> The Proxy Statement represents that a German AG organizational form was selected by Chrysler and Daimler "because it best achieved both parties' objectives[,]" which were represented in the Proxy Statement to have included, at least from the perspective of Chrysler, "the post-merger governance structure of a 'merger of equals.'" The Proxy Statement reiterates that the Transaction "would be the best means to accomplish the parties' objectives . . . including implementing a 'merger of equals' . . . ."

D.I. 1019 at 55–56 (citations omitted). Tracinda goes on to state that the representations concerning the discussions about the German AG are falsely depicted as relatively abbreviated, not controversial, not heavily negotiated, and as having occurred principally, if not exclusively on March 2, 1998.

A review of the Proxy/Prospectus as it pertains to this issue leads the Court to conclude that Tracinda has not proven that the Proxy/Prospectus was false and misleading with respect to the parties' selection of the German AG form of business entity. In its characterization of the Proxy/Prospectus, D.I. 1019 at 55, Tracinda links the selection of the German AG form to the goal of creating a merger of equals.[23] However, the actual language of the Proxy/Prospectus makes no such connection. Although the Proxy/Prospectus generally indicates that the parties discussed the impact of the jurisdiction of incorporation on the combined company's corporate governance, the Proxy/Prospectus does not link the German AG form to the "merger of equals" concept. Instead, the Proxy/Prospectus goes on to point out that the primary concern of the parties in selecting the German AG form was the tax consequences, followed by the need to gain acceptance of the transaction by the Ger-

---

designees on the Supervisory Board, were suggested by Chrysler executives on many occasions and were precipitated by personal or other valid business reasons. For these additional reasons, the Court is not persuaded that the changes that occurred rendered the merger of equals representation to be false. Indeed, the fact that many of these changes were suggested by individuals on the Chrysler side demonstrates the influence of those Chrysler individuals and gives more credence to the verity of the "merger of equals" representations.

**23.** Tracinda also argues that the selection of a German AG was important to Schrempp's alleged plan for a takeover of Chrysler.

Based on the testimony adduced at trial, the Court is not persuaded by Tracinda's argument. The unequivocal testimony of Schrempp is consistent with the testimony of Chrysler executives that the selection of the German AG was primarily for tax reasons. Schrempp Tr. Vol. G. 1452:16–1453:2; Wilson Tr. Vol. H. 1711:12–1712:22; Valade Tr. Vol. K. 2369:10–2371:7; Koch Dep. 113:6–12. Schrempp testified that he personally preferred the structure of a U.S. corporation and would not rule out, despite the attempts of Tracinda's counsel to elicit contrary testimony, that a U.S. corporation could have been approved by German stockholders, if it had been the corporate form with the tax advantage. Schrempp Tr. Vol. D. 2236:3–2238:14.

man constituency. In relevant part, the Proxy/Prospectus provides:

> Over the course of their discussions, the parties considered various alternative transaction structures for the combination of the two enterprises, including through (1) a newly incorporated U.S. company, (2) a company incorporated in The Netherlands and (3) either a newly organized German Aktiengesellschaft or Daimler–Benz itself. The simplest structural solution, a direct merger of Daimler–Benz and Chrysler, was not possible under German law. The parties believed that the structure for the Transactions was the preferable alternative to a combination through a newly-incorporated U.S. company or a company incorporated in The Netherlands because *this structure was believed to be the most tax efficient for the combined entity on an ongoing basis, could be tax-free to Chrysler's U.S. stockholders and to Daimler–Benz' German stockholders* and was the only structure which would enable the elimination of all minority stockholders of Daimler–Benz and Chrysler thereby creating a parent corporation with one group of stockholders holding a single publicly traded equity security. The structure for the Transactions was therefore selected because it best achieved both parties' objectives.

DX 20 at 48 (emphasis added). Thus, as it pertains to the selection of the German AG form, the Proxy/Prospectus does not disclose, as Tracinda contends, that the parties believed the German AG form was relevant to the "merger of equals" concept. In addition, the Proxy/Prospectus also distinguishes between the reasons for the German incorporation of the new company, and the objectives of the "Transaction," a distinction which Tracinda blurs in its representation of the contents of the Proxy/Prospectus. The term Transactions is deliberately plural (and not the singular used by Tracinda) because it refers to all of the Transactions set forth in the BCA and Proxy/Prospectus for completing the Merger. In this regard, the Proxy/Prospectus recognizes that the German AG form was desirable for tax consequences and important to the Daimler–Benz constituencies and links the selection of the German AG to these factors, but goes on to say that the "Transactions", and not the selection of the German AG, are the "best means to accomplish the parties' objectives:"

> The parties recognize that acceptance of the Transactions by important constituencies of Daimler–Benz (including German stockholders, employees and management) would be enhanced if the combined parent company were a German stock corporation (Atkiengesellschaft) because such constituencies were familiar and comfortable with that form of organization. *Consequently,* the parties decided that a new company organized under the laws of the Federal Republic of Germany should be the new public parent company and that *the Transactions would be the best means to accomplish the parties' objectives* for a business combination transaction, including implementing a merger of equals combining both companies' businesses, stockholders groups, managements and other constituencies, and further that the governance structure that had been discussed would be an appropriate management structure for the combined company in the future.

DX 20 at 49 (emphasis added).

Further, the Court is not persuaded that the Proxy/Prospectus gives the erroneous impression that this issue was not debated much or that the discussions on this topic did not extend beyond March 2, 1998. The Background of the Transaction section refers to this issue in nearly half of its paragraphs, and the paragraph following

the summary of the April 7 discussions indicates that the discussion on corporate structure extended "during that period and thereafter." DX 20 at 47–49.

#### c. Alleged omission of risk factors

██ Tracinda also contends that the Proxy/Prospectus contained material misrepresentations and omissions concerning certain risk factors which were testified to at trial by the former directors of Chrysler. Specifically, Tracinda contends that Chrysler shareholders were not warned that (1) absent a combination with Daimler (or some other company) Chrysler would not survive the next downturn in the automotive industry; (2) the Supervisory Board could remove all former Chrysler executives from the DaimlerChrysler Board of Management or eliminate the "merger of equals" and (3) the Supervisory Board could or would replace former Chrysler executives with former Daimler executives. Reviewing the Proxy/Prospectus in light of Tracinda's arguments, the Court concludes that the Risk Factors section was not false or misleading based on these alleged omissions. First, the Risk Factors section is geared toward identifying those risks accompanying a vote in favor of the Merger. As such, the risk of voting against the Merger, i.e. that Chrysler might not survive a downturn in the automotive industry, is not a risk that would be appropriately included in this section. DX 20 at 24; Item 503 of Regulation S–K. In any event, the Proxy/Prospectus does disclose that a factor the Board considered in agreeing to the Merger was the changes going on in the automotive industry, including "[t]he likelihood that the automotive industry will undergo *significant consolidation,* resulting in a smaller number of larger companies surviving as effective global competitors." DX 20 at 50 (emphasis added).

In addition, Tracinda contends that the Proxy/Prospectus failed to disclose possible changes to the corporate governance structure. However, the mere possibility of a future change is a speculative concern, and such speculation is not required to be disclosed to shareholders. *See Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 334 (S.D.N.Y.1993). As the *Sable* court explained:

> A company is not required to speculate about future events which are unlikely to occur or which the company is convinced will not occur. Such speculation could easily mislead and confuse shareholders. Furthermore, 'corporations are not required to address their stockholders as if they were children in kindergarten' .... It is thus sufficient if the company provides information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction.

*Id.*

Further, the Proxy/Prospectus explicitly disclosed that (1) the Merger's governance provisions did not limit the Supervisory Board's duties and responsibilities under German law, DX 20 at A–16;(2) that the Supervisory Board had the power to remove members of the Management Board (*id.* at 131) and (3) the BCA contained "no provisions that would bar governance changes after the [DaimlerChrysler] Transactions have been consummated." *Id.* at 17. In addition, the Proxy/Prospectus warned that:

> integration of two large companies, incorporated in different countries, with geographically dispersed operations, and with different business cultures and compensation structures, presents *significant management challenges.* There can be no assurance that this integration, and the synergies expected from that integration, will be achieved as

rapidly or to the extent currently anticipated.

*Id.* at 24 (emphasis added). Accordingly, the Court is persuaded that sufficient information was provided to the investors in a reasonable format so as to enable investors to draw their own conclusions as to the risks of the transaction, including the risk of corporate governance changes.

### d. Alleged non-voting members of the Management Board

■ Tracinda also alleges that the Proxy/Prospectus falsely represented that the two non-automotive members of the DaimlerChrysler Board of Management were non-voting members, when in fact these members were voting members just like the other sixteen members. The representation to which Tracinda refers appears in a May 6, 1998 press release issued by Chrysler which was attached to Chrysler's Form 8–K. With respect to the Form 8–K, the Proxy/Prospectus provides that "Chrysler's Current Reports on Form 8–K, dated February 6, 1998 and May 7, 1998" are incorporated by reference. The part in question appears in a chart on the last page of the press release entitled "Board of Management" and lists the individuals from Chrysler and Daimler–Benz who would be serving on the Board. The last two people on the Daimler–Benz side are designated as follows:

EVP—DASA (Bischolf)—Non–Voting

EVP—Debis (Mangold)—Non–Voting

PX 206 at DCX 0073146. However, with respect to documents incorporated by reference, the Proxy/Prospectus expressly provides:

> Any statements contained herein, or in a document incorporated or deemed to be incorporated by reference herein, shall be deemed to be modified or superseded

for purposes of this Proxy Statement/Prospectus to the extent that a statement herein, or in any other subsequently filed document that is or is deemed to be incorporated by reference herein, modifies or supersedes such previous statement. Any statement so modified or superseded shall not be deemed to constitute a part hereof except as so modified or superseded.

DX 20 at 4. The Proxy/Prospectus goes on to discuss the composition of the DaimlerChrysler Management Board in numerous places, including the attached BCA, and includes its own charts listing the same members as contained in the press release, with no designation or reference that these members would not be voting. The DaimlerChrysler AG Memorandum and Articles of Association also makes no reference to non-voting members of the Management Board. Because the Proxy/Prospectus controls as to any statement incorporated by reference and the Proxy/Prospectus contains no reference that any members of the Board of Management would be non-voting, the Court finds that Tracinda has failed to establish a misrepresentation based on the incorporation by reference into the Proxy of Chrysler's Form 8–K, which contained the press release in question.

### 2. Whether Tracinda Has Demonstrated Reliance, Materiality and Causation With Respect To The Alleged Written Misrepresentations

Even if the written representations raised by Tracinda are false, the Court concludes that Tracinda has not demonstrated the materiality and reliance elements necessary to prove its claims for violation of the securities laws.[24] In gen-

---

**24.** Although reliance is not an element required to establish a Section 14(a) claim, materiality is required.

eral, a misrepresentation or omission is considered material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The significance of any misrepresentation or omission is determined by examining the total mix of information available to a reasonable investor. *Tracinda*, 197 F.Supp.2d at 57 (citations omitted). Thus, a misrepresentation or omission may also be material if a reasonable investor would view it as "significantly altering the total mix of information available." *Id.* (citations omitted). Where a transaction involves a single purchaser and a single seller, however, courts have recognized that it may be appropriate to consider the question of materiality and reliance from a more subjective perspective. *See, e.g., Harnett v. Ryan Homes, Inc.*, 496 F.2d 832, 838 n. 20 (3d Cir.1974); *Ferdinand Drexel Investment Co., Inc. v. Alibert*, 723 F.Supp. 313, 329–330 (E.D.Pa. 1989), *aff'd mem.*, 904 F.2d 694 (3d Cir. 1990).

Although the Chrysler/Daimler–Benz Merger was a transaction completed on the open market, then dealings of the companies with Tracinda occurred on a one-to-one level. In these circumstances, the Court cannot ignore the sophistication of Tracinda as an investor and its subjective views regarding the transaction in light of the information that was available to it, which was far more than that which is available to the average investor, both by virtue of its position on the Chrysler Board and by its relationship with the individuals negotiating the transaction.

After considering the evidence adduced at trial, including the testimony of Kerko-rian and other Tracinda representatives, the Court finds that the corporate governance issues, including the "merger of equals" label, the selection of the German AG form, and the voting status of members of the management, were not significant to Tracinda. First, and perhaps foremost, the evidence establishes that Tracinda entered into the Stockholder Agreement which obligated it to vote its shares in favor of the Merger prior to the preparation and filing of the Proxy/Prospectus, including the public release of the alleged misleading press release attached as an exhibit to the Chrysler 8–K and incorporated by reference into the Proxy/Prospectus. As the Court has previously concluded, Tracinda has not proven that it was fraudulently induced to enter into the Stockholder Agreement. The BCA, which recited that Tracinda had already entered into the Stockholder Agreement, was signed in the evening hours in London on May 6, 1998, well before the public release of the press release or the filing of the Form 8K and the Proxy/Prospectus. Because Tracinda was contractually bound to vote its shares in favor of the Merger prior to the filing of the Proxy/Prospectus and the issuance of the press release, and Tracinda has not established that it was fraudulently induced to enter the Stockholder Agreement, the Court concludes that Tracinda cannot establish that it relied on the Proxy/Prospectus or the press release accompanying the Form 8K filing in making its decision to vote its shares in favor of the Merger.[25]

Moreover, much of the information contained in the Proxy/Prospectus was already known to Tracinda before it entered into the Stockholder Agreement, thereby

---

**25.** Kerkorian confirmed at his deposition and at trial that, while the Proxy/Prospectus was reviewed by Mandekic, Kerkorian did not pay attention to the specifics contained in it, be-cause Tracinda had already approved the Merger by virtue of its signing of the Stockholder Agreement. Kerkorian Dep. 279:8–14; Kerkorian Tr. Vol. C. 663:4–665:1.

undercutting Tracinda's assertions of reliance and materiality. *Milton v. Van Dorn Co.*, 961 F.2d 965, 972 (1st Cir.1992) (materiality not established where plaintiff knew about non-disclosed facts before making investment decision); *Miller v. Grigoli*, 712 F.Supp. 1087, 1093–1094 (S.D.N.Y. 1989). For example, Tracinda knew before it entered into the Stockholder Agreement that DaimlerChrysler would be incorporated as a German AG. This was included in Aljian's memo to Kerkorian, was disclosed on the first page of the BCA, and was known to Kerkorian since DaimlerChrysler's incorporation in Germany led Tracinda to sell a large number of its Chrysler shares before the Merger to insure receiving tax-free treatment of the shares it was to receive from DaimlerChrysler as a German AG. DX 107, DX 20 at A–1; Kerkorian Tr. Vol. C 667:11–668:12. Tracinda also knew before the Merger of the risks Chrysler faced if it did not merge with another company. York prepared a memo advising both Kerkorian and Aljian of the same risks that the Chrysler directors discussed at trial, which Tracinda now contends were omitted from the Proxy/Prospectus. DX 35 at T 8813.

In addition, the Court concludes that the materiality of the representation concerning the non-voting status of the two Daimler–Benz board members is undercut by Tracinda's failure to question that representation. *See Rowe v. Maremont Corp.*, 850 F.2d 1226, 1235, 1237 (7th Cir.1988). Neither the BCA nor the Proxy/Prospectus mentioned anything about non-voting members of the Management Board, and therefore, Tracinda had information which called into question that representation but failed to take any action to confirm or question it.

Further, as the Court has previously concluded in the context of the oral representations concerning the merger of equals, Tracinda has not demonstrated that corporate governance issues were material to it or that it relied on any representations concerning corporate governance. *See infra* Section IV.A.3. of the Court's Conclusions of Law. As the documentary evidence and testimony demonstrate, Tracinda was focused on the economics of the transaction and corporate governance and structure issues were not given any real weight at the time of the transaction. Kerkorian Tr. Vol. B. 297:18–20. Tracinda's internal analyses, including memos prepared at the request of Kerkorian focused solely on the economics of the transaction, and Kerkorian himself supported the Merger before he spoke to anyone regarding the governance of the new corporation. Kerkorian Tr. Vol. B 423:4–12. Moreover, when corporate governance changes occurred, including replacements and downsizing of the Daimler–Chrysler Management Board, these changes were supported by Tracinda's representative Aljian, *see, e.g.*, Aljian Dep. 415:13–23; DX 573 at T 10214; Schrempp Tr. Vol. F. 1279:7–25; DX 573; DX 77 at DCX 107447; Wilson Tr. Vol. H. 1744:2–8; Lanigan Tr. Vol. I.2021:10–22, and either not brought to the attention of Kerkorian because they were deemed unimportant, or when brought to his attention were ignored. Kerkorian Tr. 689:10–691:2, 700:7–703:3, 400:8–14, 685:10–686:13; Kerkorian Dep. 349:18–22; Aljian Dep. 344:22–19, 416:21–418:17, 422:14–423:12. Accordingly, the Court concludes that Tracinda has not proven materiality or reliance on the alleged written misrepresentations.

## V. Whether Tracinda Has Established By A Preponderance Of The Evidence Its Claims For Control Person Liability Under Section 20 Of The Exchange Act

Control person liability under Section 20 of the Exchange Act is predicated upon establishing a primary violation of the fed-

eral securities laws by a controlled person. In this case, the Court has concluded that Tracinda has not proved a primary violation of the securities laws. Accordingly, the Court will enter judgment in favor of Defendants and against Tracinda on its claims of control person liability.

## CONCLUSION

For the reasons discussed, the Court concludes that Tracinda has failed to prove its claims of common law fraud and violations of the Exchange Act. Because the Court has concluded that Tracinda has not established the elements of its claims, specifically a material misrepresentation, and for its common law fraud and Section 10 claims in particular, the element of reasonable reliance, the Court will not address the remaining questions of scienter and damages. In sum, the Court will enter final judgment in favor of Defendants and against Tracinda on all claims.

An appropriate Order will be entered.

## FINAL JUDGMENT ORDER

At Wilmington, this 7 day of April 2005, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants, Daimler-Chrysler AG, Daimler–Benz AG, Jüergen Schrempp, Manfred Gentz, and against Plaintiff, Tracinda Corporation, on Plaintiff's claims of common law fraud and violations of Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 and Rules 10b–5 and 14a–9 of the rules promulgated thereunder.